Harvey GOODMAN, Plaintiff,

v.

The CITY OF CRYSTAL RIVER, Defendant.

No. 82–176–Civ–OC–14.

United States District Court, M.D. Florida, Jacksonville Division.

April 27, 1987.

Peter L. Dearing, Robert M. Foster, Esquire, Mahoney, Adams, Milam, Surface & Grimsley, Jacksonville, Fla., Jeffrey A. Sarrow, Plantation, Fla., for plaintiff.

Dorothea Beane, Asst. U.S. Atty., Jacksonville, Fla., Steven C. Calvarese, U.S. Army Corps of Engineers, Jacksonville, Fla., for Corps of Engineers.

Andrew G. Pattillo, Jr., Russell W. La-Peer, Pattillo & McKeever, P.A., Laurel Run Professional Center, Ocala, Fla., for City of Crystal River.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER,[*] Senior District Judge.

### FINDINGS OF FACT

1. Plaintiff, Harvey Goodman, is a citizen of the United States and a resident of the State of Florida.

2. Defendant, the City of Crystal River, is a political subdivision of the State of Florida.

3. The United States of America and Charles Myers, III, Commander of the Jacksonville District, Corps of Engineers, Department of the Army, are counterclaim defendants.

4. Three Sisters Springs (hereinafter "Three Sisters") is a body of water located

[*] The Honorable David S. Porter, United States Senior District Judge, Southern District of Ohio, sitting by designation.

in Citrus County, Florida within the incorporated area of the City of Crystal River.

5. The land adjacent to Three Sisters is privately owned by the plaintiff, having been acquired in transactions dated January 29, 1980 and February 1, 1980. In June of 1983, plaintiff secured a Disclaimer to the submerged land under Three Sisters from the State of Florida Internal Improvement Trust Fund.

6. The State of Florida was admitted to the Union in March 1845. In 1846, a federal General Land Office survey was conducted of what is now Citrus County, including the Crystal River and the area where Three Sisters is located. The survey was silent as to the existence of Three Sisters and there is no evidence that Three Sisters was meandered.

7. At least as far back as the 1920s, residents of Citrus County would pilot small fishing boats known as skiff boats into Three Sisters by way of a channel, or spring run. The spring run connected Three Sisters to another body of water, dubbed Idiot's Delight, which in turn eventually fed into King's Bay of the Crystal River.

8. Mr. Louis Revels, 65, lived for 24 years in the Crystal River area where he was a commercial fisherman. He testified that as a child in the late 1920s and early 1930s he and his friends would gain access to Three Sisters by rowing 16-foot boats through the spring run connecting Idiot's Delight and Three Sisters Springs. Mr. Revels stated that the water ranged in depth from one to two feet at its shallowest and that the boats had no problem with ingress and egress.

Mr. Revels testified that besides for play, the children used Three Sisters as a fishing hole and that the fish caught were sold to earn spending money.

In 1935, Mr. Revels began fishing commercially. He testified that approximately a dozen times he conducted commercial fishing operations in Three Sisters. He further testified that he was unaware of any artificial channelization or other artificial alteration of the spring run.

9. Mr. Robert Hatfield, a long-time Crystal River resident and a Florida Marine Patrol officer for the past 23 years who served all of that time in the Crystal River area, testified that he first ventured through the spring run and into Three Sisters in 1948 in a 14-foot-long, 4-foot-wide wooden skiff boat. He testified that at that time the spring run was in a completely natural state.

10. Mr. Robert Edge, son of a boat builder, and a commercial fishing guide and Crystal River resident for 60 years, testified that in 1937 and 1938 he could and did take a 15-foot to 18-foot skiff boat into Three Sisters with no difficulty. He indicated that wooden skiff boats were the most prevalent type of watercraft in the area at the time. They were used for transportation, commercial fishing and recreation. He testified that in the early 1940s he conducted commercial fishing operations in Three Sisters and that after the war he carried paying customers into Three Sisters so they could fish.

Mr. Edge also testified that as early as 1937 (as far back as he could remember) area residents would boat into Three Sisters, fill large jugs and barrels with Spring water and haul the water out for drinking. He also testified that Three Sisters was the primary, if not the only, source of drinking water for the inhabitants of the area's islands.

Finally, Mr. Edge testified that the only hindrance to navigation he ever experienced in the spring run came from low-hanging tree limbs.

11. Mr. Thomas McQuarrie, 59, was a Crystal River resident from 1953 to 1978. Mr. McQuarrie frequented all of the waters of the Crystal River area, including the various springs. He boated, scuba dived and snorkeled and ran a dive shop. He was the man who named "Idiot's Delight," stating that only an idiot would dive there. He first took a 14-foot flatbottom boat into Three Sisters through the spring run in 1953. He would snorkel and scuba dive in Three Sisters. In 1955, 1956 and 1957 he ran a glassbottom sightseeing boat into

Three Sisters on which he would carry paying passengers.

Mr. McQuarrie testified that the spring run had not been artificially dredged and that it remained in a natural state until the 1970s when boulders were placed in the spring run to block access. The only other artificial changes he saw were the cutting back of low-hanging tree limbs.

12. No artificial dredging of canals or artificial channelization of any kind occurred in the vicinity of Three Sisters until the 1960s, and plaintiff's claim that Three Sisters was landlocked until opened by vandals is without any support whatsoever in the record.

13. The testimonial evidence was overwhelming that any dredging or artificial changes in the spring run, other than the pruning of low-hanging tree limbs, occurred after 1960. The 1944 and 1951 photographs (defendant's exhibits 36, 37 and 38) corroborated the testimony.

14. Aerial photographs taken in 1944 and 1951 (defendant's exhibits 36, 37 and 38) and viewed by the process of photogrammetry are conclusive demonstrative evidence that an outlet channel from Three Sisters consistent with the one described by numerous witnesses existed as early as 1944.

15. Mr. Louis Motz, a hydrologist and water resources engineer, testified there was no evidence of subterranean seepage from Three Sisters and no evidence of cave formations. He indicated that all water discharged from Three Sisters flowed out by way of the spring run.

16. While evidence on the effects of the tides on Three Sisters is somewhat inconsistent, we find that Three Sisters was subject to the ebb and flow of the tides prior to any artificial channelization in the vicinity of Three Sisters.

Plaintiff's expert, Mr. Garald G. Parker, Sr. testified that during his 1945 visit to Three Sisters he noticed a slight tidal fluctuation. He said this was evidence of subterranean seepage.

Mr. Ivan Williams, who in 1938 at age 17 or 18 visited Three Sisters for the first time, testified that at that time the tidal variances were significant enough that at low tide it was difficult to get some large boats into Three Sisters while at high tide there was no problem.

Mr. Robert Edge testified that he had no problem navigating a skiff boat into Three Sisters at high or low tide, but that there was a tidal variance of 6–12 inches. But Mr. Hatfield, the Florida Maine Patrol Officer, testified that in the late 1940s he did not observe any tidal effect.

17. Plaintiff's expert, Garald G. Parker, Sr., visited Three Sisters on one afternoon in 1945 as a member of a U.S. Geological Survey team. He testified that at the time no channel connected Three Sisters to Idiot's Delight and the Crystal River. He did say that he observed a swale or depression leading from the spring. Defendant's expert, Dr. David Gibson, an associate professor of surveying and engineering at the University of Florida, presented aerial photos which showed the existence of a channel as early as 1944. Gibson also testified that the silence of the 1846 General Land Office survey as to Three Sisters was not conclusive that Three Sisters was non-navigable at that time. Dr. Gibson testified that the only watercourse such a surveyor would encounter would be those that fell across the boundary line of the action being surveyed. He further testified that because of the need for speed, surveyors generally meandered only those bodies of water that they could not cross on foot.

18. It is beyond dispute that today Three Sisters is affected by the ebb and flow of the tides. Defendant's exhibit 4F and related exhibits are photographs which show tidal watermarks on the pilings placed at the mouth of the spring run and are conclusive demonstrative evidence. This was corroborated by the testimony of Mr. Ronald Silver, supervisory biologist of the Corps of Engineers, who stated that the marks on the pilings were the result of rising and falling tides.

19. George Sterchi, owner of Three Sisters immediately prior to plaintiff, attempted in the early 1970s to restrict boating access to Three Sisters by placing rocks in

the spring run. Mr. Sterchi testified that he removed the rocks when ordered to do so by the Corps of Engineers.

20. On January 10, 1983 plaintiff was granted permit No. 82F–1059 (defendant's exhibit 5) by the Corps of Engineers to place 6–inch-diameter wooden pilings, 46 inches apart center to center, at the mouth of the spring run to restrict the access of larger motorized boats without inhibiting the access of small boats, canoes and kayaks. There is no doubt that access restriction was needed. The wakes of power boats were eroding the spring banks, some thoughtless boaters were dumping trash and debris in Three Sisters and the level of activity caused Three Sisters to resemble an overcrowded hot tub more than a natural retreat. The Corps of Engineers affirmatively considered environmental impact in awarding the application and balanced that against the need for public access.

21. Plaintiff tried to block access to Three Sisters in July of 1983 by stretching a cable across the mouth of the spring run. The cable was removed pursuant to a Cease and Desist Order issued by the Corps of Engineers (defendant's exhibit 6).

22. On August 11, 1983 plaintiff applied for a permit to extend a chain link fence across the mouth of the spring run. The Corps of Engineers denied the permit in October of 1983 (defendant's exhibit 7).

Later, in August of 1983, the plaintiff applied for a permit to install riprap in Three Sisters to curtail erosion. The Corps issued the permit in April of 1984 (defendant's exhibit 10).

23. On October 2, 1984 plaintiff was issued a permit allowing him to vacuum Three Sisters' bed to remove accumulated refuse and debris, but plaintiff's attempt to characterize Three Sisters as "non-navigable" in his permit application was promptly addressed, denied and corrected by the Corps (defendant's exhibit 11).

24. Currently, a floating wooden dock or diving platform is situated in Three Sisters. No installation permit was ever sought. In November of 1985, the Corps of Engineers issued a Cease and Desist Order requiring removal of the dock. To date, plaintiff has failed to remove it or to apply to the Corps for a permit to continue its presence.

## CONCLUSIONS OF LAW

### I.

Three Sisters Springs is a body of water fed by three natural springs situated in the midst of what was once pristine, wooded wetland. Today, the victim of encroaching civilization, Three Sisters has been reduced to a meager oasis of natural beauty amid a vast expanse of suburban sprawl. Because of overuse and misuse by boaters, Three Sisters itself is now in jeopardy. Its banks are eroding, its water clouding and its bottom collecting silt and muck.

Plaintiff, Harvey Goodman, acquired the land surrounding Three Sisters in early 1980 (Finding 5). Concerned with the deterioration of Three Sisters, as well as trespassing on his land by those using the spring, the plaintiff has tried a number of ways to restrict or completely block access by boat to Three Sisters.

The Corps of Engineers, Department of the Army, views Three Sisters and the channel leading thereto as navigable waters of the United States subject not only to Congress's regulatory authority under the Commerce Clause, but also subject to a federal navigational servitude. Not surprisingly, a dispute arose and the plaintiff brought a suit. He seeks damages under 42 U.S.C. § 1983 alleging that the City of Crystal River denied his constitutionally protected rights by failing to properly enforce city trespassing ordinances against those using the spring. He alleges this constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment and amounts to a taking of his property for public use without just compensation.

This case came on for trial in the Middle District of Florida in Ocala, Florida on January 19, 1987.

The City, pursuant to Federal Rules of Civil Procedure 13(h) and 19(a), has joined the United States as a counterclaim defend-

ant. The United States has asserted a crossclaim for injunctive relief against the plaintiff to require him to remove an unauthorized offending structure (a wooden platform) placed in Three Sisters (finding 24) and to require him to apply to the Corps of Engineers for a permit to allow the presence of the structure.

Before the Court, however, is the sole issue of whether the body of water known as the Three Sisters Springs historically has been navigable so as to have imposed a federal navigational servitude on the water of Three Sisters. If a federal navigational servitude was created, the claims of the plaintiff, Harvey Goodman, must fail because he would have no right to restrict public access (by water) to Three Sisters except pursuant to a permit properly issued by the Corps of Engineers, Department of the Army. Because we hold that Three Sisters is and has been at all relevant times navigable waters of the United States and subject to the federal navigational servitude, plaintiff's claims are denied. The City of Crystal River is entitled to the declaratory relief it seeks and the Corps of Engineers request for an injunction is granted.

## II.

■ Plaintiff places great reliance on a Disclaimer he secured from the State of Florida Internal Improvement Trust Fund to the land submerged under Three Sisters. Such reliance is misplaced. The question of navigability is a federal question. *Utah v. United States*, 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279 (1971); *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). The fact that the State of Florida has issued a disclaimer may well be relevant but it is in no way determinative.

First, the state improvement board based its decision to issue the disclaimer on a title search and on the results of an 1846 survey by the General Land Office (Finding 6). The surveyors were instructed to meander all navigable water bodies. The survey was silent as to the existence of Three Sisters (Finding 6). From this the State

concluded that at the time of the survey Three Sisters was non-navigable. Although not without reason, we find such a conclusion unwarranted in this case. Dr. David Gibson, a professor of surveying and engineering at the University of Florida, testified that because a premium was placed on speed, the surveyors oftentimes would only meander watercourses through which they could not walk. Moreover, Dr. Gibson pointed out only approximately 200 of Florida's approximately 20,000 lakes were even surveyed.

Given the foregoing it would be improvident to decide this case upon the state determination alone. The case upon which the plaintiff relies, *Odom v. Deltona Corp.*, 341 So.2d 977 (Fla.Sup.Ct.1977), states that "non-meandered lakes and ponds are rebuttably presumed non-navigable." *Id.* at 989. That court goes on to say, however, that such water bodies should be regarded as non-navigable "absent evidence of navigability." *Id.* at 989. As discussed below, there is sufficient evidence of navigability to rebut the presumption.

Second, while we accord due regard to any state determination, navigability is a federal question of mixed law and fact. *United States v. Utah*, 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931); *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 404, 61 S.Ct. 291, 298, 85 L.Ed. 243 (1940). Thus, we cannot abdicate our responsibility to examine the facts and apply to them the federal law.

Third, to the extent the plaintiff is attempting to analogize the Florida determination of private ownership in the instant case with that made by the State of Hawaii over a fishpond in *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), he is mistaken. *Kaiser Aetna* will be discussed more fully below so it is sufficient to state here that in *Kaiser Aetna* the pond was historically private property before, during and after Hawaii's statehood. The property surrounding and under Three Sisters vested in the State of Florida at the time Florida joined the Union by operation of the Equal

Footing Doctrine. It only became private property pursuant to state law after Florida attained statehood.

## III.

The rule of "navigability" dates back to *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871) in which the United States Supreme Court held that navigable in law means navigable in fact. "Rivers are navigable 'when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in customary modes of trade and travel on water.'" *Loving v. Alexander,* 745 F.2d 861, 864 (4th Cir.1984) (*quoting The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871)). *See also, United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 406 n. 21, 61 S.Ct. 291, 298 n. 21, 85 L.Ed. 243 (1940).

■ Although applicable on its face only to rivers, the above-stated test for navigability actually applies to all watercourses. *Utah v. United States,* 403 U.S. 9, 10–11, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). A waterway is never again capable of private ownership once it is held to be navigable. "When once found to be navigable, a waterway remains so." *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940). The evidence adduced at trial is overwhelming that as early as the late 1920s Three Sisters Springs was connected by a spring run to another body of water that later became known as Idiot's Delight (Findings 7, 8, 9, 10 and 11). The water from Three Sisters Springs flowed through the spring run to Idiot's Delight, the water of which in turn flowed into the King's Bay of Crystal River and eventually into the Gulf of Mexico (Findings 7, 8, 9, 10 and 11).

The evidence was also overwhelming that as early as the late 1920s Three Sisters was accessible by boat from King's Bay and Crystal River and that those who did boat into Three Sisters did so to fish commercially and otherwise, to obtain drinking water and, later, to snorkel, scuba dive and conduct commercial sightseeing expeditions (Findings 7, 8, 9, 10 and 11). The "skiff boats" or "mullet skiffs" used for these fishing operations were commonly used by fishermen and residents of the region (Findings 7, 8, 9, 10 and 11). Finally, the weight of the evidence indicates that Three Sisters was affected, at least to a slight degree, by the ebb and flow of the tides (Findings 16 and 18).

The only evidence presented at trial supporting a conclusion that Three Sisters was landlocked or inaccessible by boat in this century came from the plaintiff's expert, Garald G. Parker, Sr. Mr. Parker testified that he visited Three Sisters for three hours one afternoon in 1945 as a member of a U.S. Geological Survey team (Finding 17). He testified that Three Sisters was not connected to any other body of water by a navigable channel, although he did state that there was a slight depression or swale in the ground leading from Three Sisters. We in no way impugn the integrity of Mr. Parker, a geologist of great repute. Nevertheless, sound judgment compels us to find more persuasive the testimony of the numerous fishermen and watermen who have been longtime residents of the area rather than recollections based on a single three-hour visit more than 40 years ago no matter how eminent the visitor. Given the foregoing, it is clear that Three Sisters met the test of navigability at least by the late 1920s. Moreover, no evidence exists of any artificial channelization or other manmade changes in the spring run prior to the 1960s, except for the pruning of low-hanging tree limbs (Findings 8, 9, 10, 11, 12, 13, 14 and 19). Thus, in the late 1920s Three Sisters was in its "ordinary condition"[1] and was used and susceptible of being used as a highway for commerce. While the commercial fishing of the 1920s through the 1940s was arguably slight, the extent and manner of use of a waterway is not important for a determination of navi-

---

**1.** *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871); and *Loving v. Alexander,* 745 F.2d 861 (4th Cir.1984).

gability as long as the waterway is usable as an actual avenue of commerce. *United States v. Appalachian Power Co.*, 311 U.S. 377, 424, 61 S.Ct. 291, 307, 85 L.Ed. 243 (1940). "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather the extent and manner of that use." *Economy Power & Light Co. v. United States*, 256 U.S. 113, 122–23, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). So both the spring run and Three Sisters have been navigable in fact and navigable waters of the United States since at least the 1920s.

Plaintiff stipulates that Three Sisters has been navigable in fact since the early 1950s and contends that it is irrelevant to the issue now before us whether Three Sisters was navigable as far back as the 1920s. The plaintiff argues that the status of Three Sisters at the time Florida joined the Union in 1845 controls and that the dispute in this case is materially indistinguishable from *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

*Kaiser Aetna* was the first and is the only case which has held that navigability for the purpose of federal regulation under the Commerce Clause is not coterminous with navigability for the purpose of defining the scope of the federal navigational servitude. *Kaiser Aetna*, which must be read along with its companion case, *Vaughn v. Vermilion Corp.*, 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979), stands for the proposition that navigable waterways built on private property with private funds, in such a manner that they ultimately join with other navigable waterways, do not create a general right of use in the public.[2] *Id.* at 208–209, 100 S.Ct. at 400–401.

Plaintiff relies heavily on *Kaiser Aetna* in arguing that no federal navigational servitude exits over Three Sisters. In fact, in his closing arguments, plaintiff's attorney characterized this as a *Kaiser*-type case.

*Kaiser Aetna* is an exceptional case involving exceptional circumstances. The Court characterized the case as one "in which the owner of what was once a private pond, separated from concededly navigable water by a barrier beach and used for acquatic agriculture, has invested substantial amounts of money in making improvements." *Id.* 444 U.S. at 176, 100 S.Ct. at 391.

In *Kaiser Aetna*, a 523–acre fish pond on the island of Oahu, Hawaii was situated two miles inland from Maunalua Bay, a navigable waterway, and the Pacific Ocean. Kuapa Pond, like most Hawaiian fish ponds, was considered private property since at least the first half of the 19th Century when the islands were governed by a monarchy. Kaiser Aetna leased the pond, dredged and filled parts of it, erected retaining walls, built bridges and created a marina.

Kaiser Aetna applied to the Corps of Engineers for a permit to perform all of the work, but the Corps advised that no permits were required. Later, Kaiser Aetna applied to the Corps for permission to dredge a channel connecting Kuapa Pond and Manalua Bay and a permit was granted.

By the time of trial, a community comprising approximately 22,000 residents, 1500 of whom leased waterfront lots, had grown around the marina. The United States sued the petitioners, the Bishop Estate which owned the area including the pond and lessee Kaiser Aetna, to preclude petitioners from restricting access by boat to the pond. The Supreme Court held that although the pond was a navigable waterway for the purpose of Commerce Clause regulatory authority imposing a navigational servitude under these facts would constitute a "taking" requiring compensation.

We find *Kaiser Aetna* to be distinguishable from the case before us in a number

---

**2.** The Court did not decide, however, whether or not the public had a right of use if these artificial waterways are created in whole or in part by means of a diversion or destruction of pre- existing navigable waterways, *Vaughn* at 208–209, 100 S.Ct. at 401, and we need not address that question.

of material respects. In the instant case 1) the amount of private money and effort expended for development was substantially less than in *Kaiser Aetna*, 2) the Corps of Engineers in no way acquiesced in the unpermitted actions of the plaintiff; at times the Corps issued cease and desist orders for unpermitted activity and even corrected mischaracterizations in the plaintiff's permit applications unlike *Kaiser Aetna;*[3] 3) Three Sisters was connected to and part of the navigable waters of the United States prior to any artificial improvements unlike Kuapa Pond; and 4) commerce had been regularly conducted in Three Sisters while no commerce was conducted on Kuapa Pond prior to the development.

Because Three Sisters does not fit the unique *Kaiser Aetna* pattern, we see no reason why the navigational servitude should not be coterminous with the federal government's regulatory authority over Three Sisters. The general rule of navigability for the purpose of creating a navigational servitude as set forth from *The Daniel Ball* case through the *Appalachian Power Co.* case should be applied. Under this well-established and longstanding line of cases, Three Sisters is clearly subject to a federal navigational servitude.

Plaintiff, however, contends that unless Three Sisters was part of the navigable waters of the United States at the time Florida joined the Union in 1845, it cannot be subject to a navigational servitude.

As we stated above, *Kaiser Aetna* addresses situations where navigable waterways are built on private land with private money in such a way that they ultimately connect with other navigable waterways. Even if the Three Sisters sprung into existence through a natural phenomena between 1845 and the 1920s, it does not make *Kaiser Aetna* applicable. In such a situation, Three Sisters would still be navigable waters of the United States and subject to the federal navigational servitude because the waterway would have been "used or susceptible of being used in its ordinary condition, as highways for commerce over which trade and travel are or may be conducted in customary modes of trade and travel on water." *United States v. Appalachian Power Co.*, 311 U.S. 377, 406 n. 21, 61 S.Ct. 291, 298 n.21, 85 L.Ed. 243 (1940); *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). We need not even address that hypothetical, however, because we find the evidence conclusive that Three Sisters was navigable in fact at the time Florida became a state.

As pointed out above, the evidence is overwhelming that Three Sisters was navigable in fact by the 1920s. Moreover, Mr. Louis Motz, a hydrologist and water resources engineer who specializes in water movement and distribution, testified that there was absolutely no evidence of subterranean cave formation or seepage from Three Sisters (Finding 15). Thus, Mr. Motz

---

**3.** While to distinguish their case from *Kaiser Aetna* it is not necessary to delve deeply into the permit language which the plaintiff signed in applying for and receiving various permits, it should be noted that the general conditions to the permit contained language alerting plaintiff that the Corps of Engineers was asserting its regulatory and navigational authority pursuant to 33 U.S.C. § 403.

General Condition "a" states:

[A]ny activities not specifically identified and authorized herein shall constitute a violation of the terms and conditions of this permit which may result in the modification, suspension or revocation of this permit in whole or in part ... and in the institution of such legal proceedings as the United States Government may consider appropriate...."

Moreover, in plaintiff's permit application to vacuum the floor of Three Sisters he characterized them as "non-navigable." (Defendant's ex-

hibit 11). The Corps promptly corrected that mischaracterization in a letter to plaintiff dated August 27, 1984:

During the review of your permit application, it was noticed that a portion of your application was incorrectly filled out. That section, Section 7B(3), referenced "vacuuming of non navigable spring", although a technical point, the section should have referenced the area as a "navigable waterway with limited access". In any future submittals, please make the correct reference which will help avoid misunderstandings by my staff as well as the interested public. Thank you for your cooperation in this matter.

The language and the long history of permit applications by plaintiff belie any argument that the Corps of Engineers acquiesced in any way to plaintiff's attempts to restrict access to Three Sisters.

concluded, and we conclude, that the only way Three Sisters could have discharged water was via the spring run.

We feel this evidence sufficiently meets the defendants' burden of proof. "The burden of proof as to the navigability of a stream rests upon the party asserting it." *Goose Creek Hunting Club, Inc. v. United States,* 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975) (*citing Iowa-Wisconsin Bridge Co. v. United States,* 84 F.Supp. 852, 867, 114 Ct.Cl. 464, 509 (1949), *cert. denied,* 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950). Given this evidence, there is simply no reason to believe that Three Sisters was ever non-navigable, much less non-navigable a mere 75 years before it was known to be navigable.

Plaintiff's only evidence presented to counter the defense's showing is the testimony of a single geologist, Mr. Parker, and the 1846 survey. Mr. Parker's testimony was completely contradicted by all other witnesses. Dr. Gibson, whom we find to be more credible, pointed out that the 1846 survey results are not reliable.

Our finding today in no way leaves Three Sisters unprotected from the ravages of thoughtless boaters. Since 1968 the Corps of Engineers has been charged with the duty to consider environmental impact as well as navigational concerns when reviewing permit applications. In fact, the record of the Corps issuing permits in this case shows that in permitting the pilings to be placed in the spring run, the Corps carefully balanced the need to protect Three Sisters from motor boats against the need for maximum access by canoe, kayak or rowboat.

### IV.

■ Plaintiff's argument that *Kaiser Aetna* is controlling on the facts is misplaced. *Kaiser Aetna* was an exception to the longstanding rule that the federal navigational servitude is coterminous with federal regulatory authority over waters that are navigable in fact and navigable waters of the United States. The unusual facts of *Kaiser Aetna* are not present herein so the exception carved out in that case is not applicable. In *Kaiser Aetna* the Corps of Engineers attempted to impose a navigational servitude on a pond which had been developed on private property at great private expense and was subsequently joined by an artificial channel to navigable water of the United States. In the case now before us, Three Sisters was part and parcel of the navigable waters of the United States in its natural and ordinary condition and was actually used in commerce long before a single development dollar was spent.

### ORDER

Pursuant to this Court's Order of January 5, 1987, the foregoing trial was held pursuant to 42(b) on the existence of a historical servitude, *i.e.,* a historical navigational servitude. This was determined to be conducive to expedition and economy because it was implicitly, if not explicitly, understood that such issue is decisive of this case.

This Court, for the reasons stated in our Findings of Fact and Conclusions of Law, concludes that the body of water known as Three Sisters Springs is and was navigable in fact and a navigable waterway of the United States at all material times.

Accordingly, plaintiff has no right to restrict or impede access by water to Three Sisters Springs absent a permit issued by the Corps of Engineers, Department of the Army.

Therefore, plaintiff's claims against the City of Crystal River for damages under 42 U.S.C. § 1983 for failure to arrest and prosecute boaters and swimmers in Three Sisters and the spring run leading thereto must be and are hereby denied.

The City of Crystal River's counterclaim for declaratory judgment as to federal control of Three Sisters pursuant to a federal navigational servitude is granted. We declare there is such a navigational servitude. Also, the City's counterclaim for declaratory judgment that plaintiff does not own the water of Three Sisters Springs is granted. We declare that the plaintiff does not own the water of Three Sisters.

The Corps of Engineer's crossclaim against plaintiff for injunctive relief requiring plaintiff to remove the wooden structure currently in Three Sisters unless he obtains a valid permit is granted.

The United States' and the City of Crystal River's motions for dismissal are disposed of by this order.

We need not rule on plaintiff's motion to exclude as hearsay some testimony in the videotaped deposition of Grady Black viewed at trial. The testimony of Mr. Black was not considered by the Court in reaching today's judgment.

SO ORDERED.