**LYKES BROS. INC., Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.**

No. 90–82–CIV–FTM–17.

United States District Court,
M.D. Florida,
Fort Myers Division.

May 4, 1993.

Charles W. Pittman, Harold D. Oehler, Macfarlane Ferguson, Lester Merrin Blain, Blain & Cone, P.A., Tampa, FL, for plaintiff.

Douglas Molloy, U.S. Attorney's Office, M.D. Florida, Fort Myers, FL, Carl Strass, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Defense Section, W. Christian Schumann, Environment and Natural Resources Div., Eileen T. McDonough, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, William A. Baxter, U.S. Army Engineer Dist., Jacksonville, FL, Christopher S. Vaden, Dept. of Justice, Environmental Defense Section, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOVACHEVICH, District Judge.

This cause is before the Court on the trial of this case, which took place on July 6th through 17th, 1992, and September 14th through 28th, 1992. This Court, having heard the testimony of witnesses, having considered the evidence presented, having considered the memoranda of the parties, and being fully advised in the premises, hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact are deemed to be conclusions of law, and vice versa, the same shall be deemed conclusions of law or findings of fact, as the case may be.

This Court has meandered through the tales of the creek, from the laundering at Hattie's Wash to the adventures of Billy Bowlegs, and has chained across every fact from Ingram's Crossing through the Head of the Bushes and on down through Fort Center. This Court has expended a great amount of time to fully digest the voluminous testimony, enough exhibits to fill every wall of the courtroom, and the learned memoranda of the parties.

## ISSUE

The issue is whether Fisheating Creek is a navigable water of the United States under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

## FINDINGS OF FACT

1. Plaintiff, Lykes Bros. Inc. ("Lykes") is a Florida corporation.

2. The Defendant is the United States Army Corps of Engineers, ("Corps").

3. Lykes filed this action pursuant to 5 U.S.C. § 706 to set aside the Corps' determination that Fisheating Creek ("FEC") is a navigable water of the United States subject to the Corps' jurisdiction under the River and Harbors Act of 1899.

4. There is an extensive history relating to the Fisheating Creek area because of the Second and Third Seminole Wars. In 1842, boat parties of Marines left Fort Center on a scouting reconnaissance mission, led by George Henry Preble, to proceed upstream on FEC. Preble's account of this trip showed that these boat parties had to push or carry their canoes through Cowbone Marsh ("CBM"). Preble determined the head of FEC to be in what is now referred to as the Sand Lake area, or approximately

where the flow of FEC turns from a southerly direction to an easterly direction. Preble's account shows that CBM was not navigable in 1842.

5. The maps and records show that the military established Fort Center on FEC about six miles west of Lake Okeechobee ("LOK") in about 1840. The maps and historical records show that the traffic between the west coast of Florida and Fort Center did not use any part of FEC to transport men or supplies. Men and supplies were brought from the Fort Myers area upstream on the Caloosahatchee River to Fort Thompson or Fort Denaud, which were in the area now known as LaBelle. From that point, men carrying boats and supplies traveled overland in a northeasterly direction to a point just south of FEC in the area now known as Palmdale. The military did not enter FEC in this area, but continued their overland journey in an easterly direction paralleling FEC on the south side all the way to Fort Center. It seems probable that if FEC had been navigable, the military would have used FEC to transport men and supplies from the Palmdale area to Fort Center rather than carrying these supplies overland.

6. In 1871 official government surveys were done of the land surrounding FEC. Surveyor Tannehill meandered one bank of FEC from LOK to approximately three miles west of the present location of Palmdale. Tannehill's contract and instructions required him to meander both banks of any water body which he determined to be navigable. Tannehill was required to meander only the right bank of streams that were "non-navigable" but which were well-defined arteries of internal communication. Tannehill's meandering of one bank of FEC shows that Tannehill determined FEC to be a non-navigable water body.

7. Surveyor Stearns surveyed FEC from approximately three miles west of what is now known as Palmdale to Highlands County, which is the balance of FEC subject to this litigation. Stearns operated under the same instructions as Tannehill. Stearns did not meander either bank of FEC, thereby indicating that he found FEC not to be a well-defined natural artery of internal communication.

8. Surveyors were paid wages for meandering streams and they would have been paid additionally for meandering both sides of FEC. The surveyors were the "eyes" of the federal government to determine navigability. The navigability determination was important because water bodies that were not meandered on both banks were subject to being conveyed to private interests. The surveyor who testified on behalf of the Corps agreed that he was not in a position to say that the surveyors were wrong, and he testified, "I think we have to go along with the record." (Gibson: 8/105).

9. Other surveys were done in 1859, 1907 and in the 1930's. These independent surveyors did not take issue with the determinations made by Tannehill and Stearns.

10. The historical records show that the settlement patterns in the FEC area did not develop as they did along navigable water bodies in central Florida. Even though land transportation was difficult in the FEC area, it appears that land transportation was the exclusive mode of transportation.

11. There is no evidence in the historical record that FEC was ever used upstream of Fort Center to transport goods or people in commerce. If water transportation on FEC had been feasible, FEC would have been used to transport goods and people in commerce. There is evidence that Billy Bowlegs, a Seminole Indian Chief, traveled from LOK up FEC to Sand Lake, eventually making it through Rainey Slough to the Peace River for the purpose of a bartering enterprise. This, however, was accomplished during a very wet season and there is no evidence that the dugouts were actually paddled or poled through FEC. This adventuresome journey of Billy Bowlegs does not rise to the level of rendering FEC a navigable water.

12. In 1915 the Corps made an investigation of FEC and described the creek as "impassable even in a small skiff boat ... where the creek spreads into a broad expanse of marsh." (LEX 117.04, p. 4). CBM had no defined channel. The Corps also noted that no commerce was carried on the

creek and would not likely be carried on the creek even if the creek were improved. (LEX 117.04, p. 2).

13. The aerial photographs from 1940 through 1990 show that CBM has not been navigable during this time frame. The Corps has admitted that CBM has not been navigable since either 1940 or 1959. These aerial photographs cover a time frame of fifty years. During this fifty years the runs in the northeast corner of CBM, where they join together to form a channel into Double Lakes, have remained virtually unchanged as to location and configuration. These photographs show that CBM has become wetter over these fifty years. The Hoover Dike has caused water to be contained in the FEC basin that formerly would have flowed to the southeast through Nicodemus Slough into LOK. Cypress and other wetland vegetation have invaded this area on the north side of Hoover Dike along the south side of CBM. These aerials from 1940 through 1990 do not give any indication that there has been a channel through CBM. There would have been some vegetation signature in 1940 if a channel through CBM had recently filled up.

14. The Corps of Engineers before 1967 and the United States Coast Guard after 1967, exercised jurisdiction to grant permits for bridges over navigable waters of the United States. The Corps' and the Coast Guard's records show that no permit has been issued for construction of a railroad bridge or the highway bridges across FEC. In 1978, the Coast Guard declined to exercise jurisdiction regarding permitting of a bridge over FEC at State Road 78, which is well downstream from Fort Center. The Coast Guard determined that the "subject waters are not navigable waterways of the United States." (LEX 1184)

15. Actions by the State of Florida for many years show that Florida has considered FEC to be non-navigable. All of the land in the FEC corridor in Glades County has been deeded to private interests and there are no reservations in any of those deeds for land within FEC. Lykes has deeds to most of the land under and around FEC in Glades County, and Lykes and its predecessors have been paying taxes on that land for over one hun-

dred years. There are several fences across FEC and several fences within CBM.

16. From 1959 to 1985, the State of Florida leased lands from Lykes and operated a wildlife management area in Glades County west of U.S. 27 and a wildlife refuge in Glades County east of U.S. 27. These areas encompass the FEC corridor. Fences were placed around the perimeters of these areas and across the creek in several locations. Access by the public was either limited or prohibited.

17. The information collected by agencies of the State of Florida, Division of State Lands and Department of Natural Resources, did not indicate navigability of FEC except from Fort Center to LOK. The Executive Director of the Department of Natural Resources advised the Governor and the Cabinet of these circumstances, but the State took no further action.

18. John Adams was Chief of the Corps' Regulatory Division in 1989 and he was charged with making an investigation and recommendation on the navigability of FEC. Mr. Adams' investigation indicated that FEC was not a navigable waterway of the United States.

19. A number of area residents testified about their experiences on FEC. FEC is a series of small pothole lakes, shoal areas, sandbars, narrow creek bed and marshes that begins in Highlands County, winds south to the Sand Lake area, veers east and disappears into CBM. FEC reforms at the east side of CBM and flows past the former site of Fort Center and into LOK. The small pothole lakes are wide places in the creek which are joined by narrow, winding creek beds that are dry much of the year. The creek also flows through dense cypress swamp or marshes where there is no defined channel. Hunting and trapping was done on the creek and was accomplished by transporting small boats or canoes to sections of the creek and then hauling them over impassable areas.

20. The flow in FEC depends completely on rainfall. The creek rises rapidly with rainfall and drops rapidly when the rain stops. The creek is a rapidly varying stream

and a rapidly fluctuating stream. There is no base flow, either by reservoir or by ground water, to produce predictable and reliable water levels. The rainfall in the FEC basin is unpredictable, as was demonstrated in the cross examination of the Corps' expert on hydrology when he was asked to predict from hindsight the flow of FEC in July 1981 (McQuivey: 9/124–25). The Corps' expert stated the precipitation would have been approximately seven and a half inches, when in fact records showed it had been zero (McQuivey: 9/125).

21. The only use of FEC by watercraft has involved small, shallow-draft canoes, small shallow-draft John boats, and small dugouts. These canoes and boats are in the range of 10–15 feet long, 3 feet to 4 feet wide and draw 3 to 6 inches of water. The only dugout canoes about which there was testimony on FEC were also of the small variety, about 12–14 feet long.

22. Navigability by watercraft capable of transporting goods or people in commerce is not feasible through the cypress swamps, or through the narrow shallow creek beds between the pothole lakes.

23. Lykes presented several witnesses who had attempted unsuccessfully to travel FEC by canoe. The Corps did not present any witness who had attempted to travel FEC from Highlands County to LOK.

24. The Head of the Bushes ("HOB") area and CBM are impenetrable by any kind of craft capable of carrying goods or people in commerce. This was the case during the time period that Lykes operated their recreational canoe trip on FEC. Thus, it would have been impossible for the canoes to travel to LOK from anywhere up stream of CBM.

25. FEC between Double Lakes and Fort Center is winding and tortuous, is subject to having shoals, sandbars, and extremely sharp bends. This portion of FEC is not suitable for navigation by watercraft capable of transporting goods and people in commerce.

26. FEC is a productive habitat for certain fish and animals. Fishing and hunting, when conducted from watercraft, have involved the transportation of those watercraft by vehicle to a pothole lake. The hunting and fishing are then conducted and the boat is loaded onto the truck to depart from FEC.

27. From some time in the 1970's until the mid 1980's, Lykes offered canoe trips from Ingram's Crossing to the campground at Palmdale. This was an adventure trip for recreational purposes. The trip was made in small shallow-draft canoes. This portion of FEC was landlocked by CBM while the canoe trail was operated.

28. The 1929 map is not reliable for the purpose of establishing the existence of a channel through CBM in 1929. The purpose of the 1929 map was to prepare for flood conditions where water would rise above the banks of any streams or lakes, and into the flood plain. These mappers were concerned with general topography in areas that would flood, and not with the width or depth of FEC. The mappers did not meander the thread of any stream through CBM in 1929. The contour lines that purport to cross the thread of a channel show a negligible depression that does not indicate any defined channel or any levees. Furthermore, the lakes in CBM are not shown on the 1929 map.

29. When the 1929 map is put into the historical context, it is unlikely that a well-defined, navigable channel existed through CBM in 1929. The records from the Seminole Indian Wars in the 1840's–1850's, the 1871 surveys, the 1915 Corps investigation, and the 1940–1990 aerial photographs negate the existence of a well-defined, navigable channel through CBM in 1929 and at other times.

30. The vegetation patterns do not show any signature that is consistent with a channel having existed in CBM as of 1929. The 1940 aerial photographs would show a vegetation pattern if a channel that existed as recently as 1929 had filled up, but there is no vegetation signature.

31. CBM has been a non-navigable marsh for hundreds of years, without any defined or navigable channel. The historical record, the surveys, and the Corps' investigation in 1915, all show that there was no defined or navigable channel through CBM. The Corps' expert on Hydrology took soil samples inside and outside of what he believed was a chan-

nel running through CBM (McQuivey: 11/30). He did not note any difference in the soil samples and found muck three feet deep in many places where he believed there was a channel (McQuivey: 11/31–32). The presence of a three foot layer of muck in CBM shows that CBM has been vegetated for hundreds of years, and that vegetation has decayed and deposited where it grew. Nothing has occurred to materially change CBM in the last 150 years.

32. The soil borings taken by the Corps show the absence of an old channel in CBM. The Corps' borings in CBM disclosed a relatively uniform three-foot deep deposit of muck in areas both inside and outside what the Corps sought to prove was the old channel bed. The Corps hypothesized that an old channel bed or the levees alongside an old channel would exhibit layers of different materials. This is a valid hypothesis. The Corps took several hundred core borings in CBM which did not exhibit any layering. The absence of layering establishes that these cores were not taken in an old channel bed that had filled up and were not taken in the levee of an old abandoned channel. The failure to find any layering shows that there was no channel where the cores were taken which is where the Corps sought to prove the existence of an old abandoned channel.

33. The three foot layer of muck in CBM shows that CBM has been a marsh for hundreds of years. Muck is deposited by vegetation that grew and died in the same location where it is deposited. Three feet of muck in CBM would require 1,500 years to form. A three foot fairly uniform layer of muck shows that CBM has been stable and in the same condition in which it is found today for a long period of time.

34. The existence of lakes in CBM is inconsistent with an old channel through CBM that filled up. The Corps argues that one of the lakes in CBM was part of the old channel. This lake is not shown on the 1929 map. This lake and other lakes have remained open, which is inconsistent with the filling up of a channel that is subject to the high energy of moving water.

35. McQuivey's opinions concerning an old abandoned channel through CBM do not have a valid basis, and accordingly, lack utility. The Court finds there was no well-defined thread of a channel through CBM.

36. The lowering of LOK has not significantly affected CBM, and did not eliminate any channel from CBM. In pre-drainage times the Lake level did not exceed 14.6 feet except for unusual periods of high rainfall. When LOK rose to 18 feet, an additional 13 miles of lake frontage, or a total of 32 miles of lake frontage, on the south side of LOK would overflow. The ordinary high water mark or lake margin in pre-drainage days was 18 feet, which is 2 to 3 feet below the level of CBM.

37. The hydrology of FEC supports a finding that FEC is not navigable. FEC is a rapidly varying stream with a rapidly fluctuating flow. One cannot say in any given month of a given year what the flow will be in relation to the mean or median flow. FEC is not sufficiently reliable to support commercial navigation. The median flow of FEC is 45 cubic feet per second, which is a very small flow, and considerably less than other navigable streams presented for the Court's consideration.

38. Hyacinth spraying involved an eradication program. This was a federal-state cooperative effort that involved "navigable waters, tributary streams, connecting channels, and other allied waters ... in the combined interest of navigation, flood control, drainage, agriculture, fish and wildlife conservation, public health and related purposes...." (LEX 607, p. 3). Evidence of hyacinth eradication is not probative of the issue of navigability because non-navigable water bodies and interests other than navigation were involved.

39. FEC is not a navigable water body of the United States upstream from Fort Center as a whole.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this case pursuant to Title 28, U.S.C. §§ 1331 and 1356.

■ 2. A navigable waterway of the United States is a waterway which is used, or

is susceptible of being used, in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. *Hardy Salt Co. v. Southern Pacific Transportation Company,* 501 F.2d 1156, 1167–1169 (10th Cir.1974); (citing to *The Daniel Ball,* 77 U.S. (10 Wall) 557, 559–64, 19 L.Ed. 999, 1001 (1871)).

■ 3. To qualify as a navigable waterway of the United States subject to federal jurisdiction under the Commerce Clause, the waterway must form, either by itself or by united with other waters, a continued highway over which commerce may be carried on with other states or foreign countries in the customary modes in which commerce is conducted by water. *The Daniel Ball,* 77 U.S. (10 Wall) 557, 559–64, 19 L.Ed. 999, 1001 (1871); *The Montello,* 87 U.S. (20 Wall) 430, 437–39, 22 L.Ed. 391, 393 (1874); *Kaiser Aetna v. U.S.,* 444 U.S. 164, 170, n. p. 4, 100 S.Ct. 383, 388 n. p. 4, 62 L.Ed.2d 332, 340 n. p. 4 (1979).

■ 4. This Court finds that FEC is not a navigable waterway of the United States subject to federal jurisdiction upstream from Fort Center. Therefore, the determination of the Corps of Engineers that FEC is a navigable waterway of the United States subject to federal jurisdiction must be set aside and vacated. Furthermore, FEC upstream from Fort Center has not been used and has not be susceptible for use to transport interstate commerce under the navigability test set out in the cases cited above.

■ 5. To be considered susceptible for commercial navigation, the waterway in its ordinary and natural condition must have a sufficiently well-defined, passable channel, and the water levels must be able to sustain commercial navigation on a predictable and reliable basis. *U.S. v. Harrell,* 926 F.2d 1036, 1040 (11th Cir.1991) (susceptibility of use should not be confined to exceptional circumstances). *U.S. v. Ladley,* 4 F.Supp. 580, 582 (D.Idaho 1933); *U.S. v. Crow, Pope & Land Enterprises, Inc.,* 340 F.Supp. 25, 32–33 (N.D.Ga.1972). One cannot reliably predict weather and accordingly the amount of rain in the FEC basin. The flow of this

rapidly varying stream, in terms of its discharge and stage, cannot be reliably predicted.

■ 6. Evidence of navigation during periods of flooding or abnormally high water is not sufficient to support a finding of navigability. *U.S. v. Harrell,* 926 F.2d at 1039–1040 (11th Cir.1991) (citing to *U.S. v. Utah,* 283 U.S. 64, 87, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931)); *U.S. v. Crow, Pope & Land Enterprises, Inc.,* 340 F.Supp. at 32 (N.D.Ga. 1972).

7. This Court, having tried this case during the events of Hurricane Andrew, and, noting that sea-going vessels were found in small inland canals, finds that if the law were interpreted in any other manner many of South Florida's streets would have been considered navigable. A similar phenomenon could explain the testimony of the Corps' lay witness Reeves Hendry, who testified as to the prow of a Spanish vessel purportedly being in CBM. If there were a prow of a boat in the middle of CBM, it could have arrived there by a number of means. A hurricane or an unnamed storm such as those which occur in Florida not infrequently could explain the purported existence of a boat prow in CBM.

8. The physical characteristics of FEC make commercial navigation on FEC impractical and impossible. Much of the creek was described as requiring the operator of canoe to carry or drag the boat over impenetrable vegetation or cypress knees several feet high and often following a thread of the creek to find it end in a broad expanse of marsh or an impenetrable wall of cypress trees. *U.S. v. Oregon,* 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1934); *Oklahoma v. Texas,* 258 U.S. 574, 587–588 (1922) (there are intervals of dry sand interspersed with irregular ribbons of shallow water and occasional deeper pools causing the river to not be susceptible of being used in its natural condition for commerce); *U.S. v. Harrell,* 926 F.2d 1036 (11th Cir.1991) (small, narrow, shallow, obstructed, partially dry creek that is incapable of any type of waterborne commerce).

9. Additionally, any type of boat that could possibly be used in commerce on FEC

is prevented from access to LOK by the impenetrable CBM because of its shallow depth and overgrown vegetation, thus negating the possibility of interstate commerce. *Guillory v. Outboard Motor Corp.*, 956 F.2d 114 (5th Cir.1992).

10. The type of small, shallow-draft canoe and John boat use that occurred on Fisheating Creek does not support a finding of commercial interstate navigability. *U.S. v. Oregon*, 295 U.S. 1, 23, 55 S.Ct. 610, 619, 79 L.Ed. 1267 (1934) (use of waterway by trappers and hunters in light-draft boats and canoes is insufficient to establish navigability); *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir.1975); *U.S. v. Crow, Pope & Land Enterprises, Inc.*, 340 F.Supp. 25, 34 (N.D.Ga.1972).

11. The canoe trail operated by Lykes was an adventure trip for recreational purposes. In recent years, most watercraft usage has been small, shallow-draft canoes and John boats engaged in recreational pursuits, and the nature and type of this activity does not support a conclusion that Fisheating Creek has been used or is susceptible of being used for commercial navigation. *Loevy v. U.S.*, 177 U.S. 621, 634, 20 S.Ct. 797, 802, 44 L.Ed. 914, 920 (1900). The recreational activities of these noncommercial fishing excursions, boating in small John boats and canoe trips do not render FEC susceptible of being used as an artery of commerce. *Adams*, 528 F.2d at 439.

12. The Corps argued that *Goodman v. City of Crystal River*, 669 F.Supp. 394 (M.D.Fla.1987), which was heard in this Court's District, is analogous to the case at bar and should lead to the finding that FEC is navigable. However, the *Goodman* case is distinguishable from the case at bar on numerous points, one of which is that waterway, Three Sisters Springs (TSS), in *Goodman* was directly connected to the Gulf of Mexico. There was substantial evidence that the TSS was regularly used for commercial fishing and diving as well as glass-bottom boat sightseeing. Aerial photography of TSS established the existence of a channel as early as 1944, as compared with aerial photography of FEC from 1940 through 1990 which demonstrates a channel has never existed through CBM. The only natural obstructions of TSS were low hanging tree limbs, whereas FEC was demonstrated to have tortuous shoals, sandbars and narrow twisting creek beds terminating in either impenetrable walls of cypress or expansive marsh. There are three natural springs which produce a constant base flow for the body of water, never allowing the depth to go below one to two feet at its shallowest point. In contrast, FEC is not fed by a spring; thus, is not provided a constant base flow and many of the sections of the FEC become dry sandbars. There was insufficient evidence presented in *Goodman* to demonstrate that TSS was not navigable; conversely, there was substantial evidence provided through expert testimony, lay witnesses and exhibits to show that FEC is not navigable.

13. The Court concludes that the evidence presented does not support a finding that Fisheating Creek could be made navigable by reasonable improvements. The Corps failed to present any evidence of the cost of such improvements or evidence of any commerce which would rely on the creek should such improvements be made. Without this evidence, this Court cannot determine whether the costs of improvement would be justified by the benefits to commercial transit in this area. *U.S. v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407–408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940); *Sierra Pacific Power Co. v. FERC*, 681 F.2d 1134, 1139 (9th Cir. 1982).

14. Furthermore, evidence of hyacinth eradication does not support a finding of navigability in that the hyacinth program was an eradication program that involved navigable and non-navigable water bodies and the program was to serve various other purposes as well as navigation.

15. The Court concludes that Cowbone Marsh has been a non-navigable marsh for at least 150 years, which has blocked for at least 150 years access to Lake Okeechobee from any point upstream of Cowbone Marsh by any watercraft capable of conducting commercial transportation. The argument that hunters or trappers traveled on FEC to deliver their hides or other products to markets

that would ship the goods to other states by land transportation does not constitute navigability. A land-locked waterway with no direct navigable link to interstate or foreign waterways cannot be considered a "navigable waterway of the United States" under the *Daniel Ball* test. *Hardy Salt v. Southern Pacific Transportation Co.*, 501 F.2d 1156 (10th Cir.1974) (connecting a land locked body of water to a railhead to transport goods in interstate commerce does establish navigability under the Rivers and Harbors Act); *Minnehaha Creek Watershed District v. Hoffman*, 597 F.2d 617 (8th Cir.1978); *National Wildlife Federation v. Alexander*, 613 F.2d 1054, 1059–60 (D.C.Cir.1979); *Sierra Pacific Power Co. v. FERC*, 681 F.2d 1134, 1138, 1140 (9th Cir.1982).

16. The Court concludes that Fisheating Creek upstream from Fort Center is not a navigable water body of the United States based upon the historical records, military activities, the Seminole Indian Wars, official government surveys, settlement patterns circa 1900, 1915 Corps investigation, aerial photographs from 1940 to 1990, Corps and Coast Guard bridge permitting determinations, activity by the State of Florida, observations by area residents and others who have personal experiences on Fisheating Creek, and other evidence presented.

17. The Court concludes upon the evidence as a whole that Fisheating Creek upstream from Fort Center is not a navigable water body of the United States subject to federal jurisdiction under the Commerce clause.

Plaintiff is directed to present within ten days a final judgment based on these Findings of Fact and Conclusions of Law after consultation with Defendant as to the form of such final judgment.

**DONE and ORDERED.**