18 P.3d 722

**DEFENDERS OF WILDLIFE, a nonprofit corporation; James A. Slingluff; Timothy J. Flood; and Joanne Finch, Plaintiffs–Appellants,**

and

**State of Arizona, Defendant–Appellant,**

v.

**Governor Jane Dee HULL, Defendant–Appellee,**

**Phelps Dodge Corporation; Salt River Valley Water Users Association; Salt River Project Agricultural Improvement and Power District, Intervenors–Appellees.**

No. 1 CA–CV 99–0624.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 13, 2001.

Reconsideration Denied May 8, 2001.

415

Arizona Center For Law In The Public Interest, by Timothy M. Hogan, Tina A. Calos, Jennifer B. Anderson, Phoenix, Attorneys for Plaintiffs–Appellants.

Janet Napolitano, Attorney General, by Joseph P. Mikitish, Assistant Attorney General, Laurie A. Hachtel, Assistant Attorney General, Paula S. Bickett, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant State of Arizona.

Gallagher & Kennedy, P.A., by John E. Lundin, Phoenix, Attorneys for Defendant–Appellee Governor Hull.

Ryley, Carlock & Applewhite, by L. William Staudenmaier, N. Warner Lee, and Dawn M. Meidinger, Cynthia M. Chandley, Phoenix, Attorneys for Intervenor–Appellee Phelps Dodge Corporation.

Salmon, Lewis & Weldon, P.L.C., by M. Byron Lewis, John B. Weldon, Jr., Mark A. McGinnis, Brenda W. Burman, Phoenix, Attorneys for Intervenors–Appellees Salt River.

H. Jay Platt, St. Johns, Attorney for Amicus Curiae Arizona Farm Bureau.

## OPINION

PATTERSON, Judge.

¶ 1 Defenders of Wildlife (Wildlife) and the State of Arizona appeal from the trial court's grant of summary judgment in favor of Phelps Dodge Corporation, Salt River Valley Users Association, and Salt River Project Agricultural Improvement and Power District (Salt River), which upheld the validity and application of Senate Bill (S.B.) 1126. For the reasons that follow, we reverse the trial court's grant of summary judgment and remand for entry of summary judgment in favor of Wildlife and the state on their claim that S.B. 1126 is a violation of Arizona's gift clause and the public trust doctrine.

## I. BACKGROUND AND FACTS

 ¶ 2 The headwaters of this meandering case have their origins in 1985, when certain Arizona officials began to assert the state's right of ownership over all bedlands under navigable watercourses. Although lying dormant for some 73 years,[1] the state's claims were an assertion of Arizona's rights under the common-law "equal footing" doctrine, which vests in the sovereign title to all lands affected by the ebb and flow of tides. *See Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 410, 412–13, 10 L.Ed. 997 (1842). Arizona's rivers, as inland watercourses, are also covered by the doctrine. *See Illinois Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 436–37, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). Under the equal footing doctrine, on the day in which individual states enter the Union, title to the lands under territorial navigable watercourses is transferred from the federal government to the newly-established state government. *See Land Dep't v. O'Toole,* 154 Ariz. 43, 45, 739 P.2d 1360, 1362 (App.1987); *see also Pollard's Lessee v. Hagan,* 44 U.S. (3 How.) 212, 223, 11 L.Ed. 565 (1845). This common-law

---

1. This dormancy does not affect the validity of the claims as "[n]either doctrines of laches nor statutes of limitations of actions can be allowed to defeat the state's sovereign title to trust lands." *State of North Dakota ex rel. Bd. of Univ. and Sch. Lands v. Andrus,* 506 F.Supp. 619, 625 (D.N.D.1981) (reversed on other grounds, *Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983)).

rule was subsequently written into the Submerged Lands Act of 1953. 43 U.S.C. § 1311(a) (1995). The transfer of land interests by means of the equal footing doctrine has been grounded in the Constitution by the United States Supreme Court, which recognized that the federal government held the lands in trust for the states. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 374, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *see also Pollard's Lessee*, 44 U.S. (3 How.) at 223, 229–30. The claims of Arizona's officials, however, immediately clouded the title held by political subdivisions, private individuals, and corporations that had for years exercised control over, made improvements to, and paid taxes upon these affected stretches of land.

¶ 3 In 1987, the Arizona Legislature passed House Bill (H.B.) 2017, which attempted to relinquish most of the state's interest in Arizona's watercourse bedlands. Parts of H.B.2017 were determined to be invalid by this court under both the Arizona Constitution's gift clause and the public trust doctrine. *Ariz. Ctr. For Law In The Pub. Interest v. Hassell*, 172 Ariz. 356, 371, 837 P.2d 158, 173 (App.1991). Specifically, we held in *Hassell* that, because the state has fiduciary obligations to maintain the public trust, the state must "provide a mechanism for particularized assessment of . . . the validity of the equal footing claims it relinquishes" before disclaiming the state's interest in any of Arizona's watercourse bedlands. *Id.*

¶ 4 Although the state had yet to determine the navigability of any watercourse whose underlying bed was within the scope of H.B.2017, in *Hassell* we found evidence in the record to support navigability. *Id.* at 363, 837 P.2d at 165. Therefore, we concluded that Arizona had a substantial enough interest, "though still uncertain in value and extent," to warrant gift clause and public trust analysis. *Id.* at 364, 837 P.2d at 166.

¶ 5 In response to *Hassell*, the Arizona Legislature passed legislation in 1992 (the 1992 Act) to once again address the state's claims to the land under Arizona's watercourses. *See* Ariz.Rev.Stat.Ann. (A.R.S.) §§ 37–1121 to 1131 (1993).[2] As part of a comprehensive scheme to investigate and adjudicate the state's claims, the 1992 Act established the Arizona Navigable Stream Adjudication Commission (Commission). A.R.S. § 37–1121 (1993). The Commission would compile information gathered through the investigative efforts of the State Land Department, as well as hold its own public hearings. A.R.S. §§ 37–1123, –1124, –1126 (1993). The Commission would then issue a "final administrative determination" regarding navigability. A.R.S. §§ 37–1128(A) (1993). This administrative adjudication was, according to statute, subject to judicial review. A.R.S. § 37–1129 (1993).

¶ 6 In 1994, the legislature made significant changes to the statutes governing the parameters and procedures of the Commission (the 1994 Act). 1994 Ariz. Sess. Laws, ch. 277, §§ 1–14, eff. April 25, 1994. After these changes, the Commission ceased to function as an adjudicatory body and instead operated, in both theory and practice, as merely a fact-finding, legislative advisory committee. In addition, when collecting information regarding navigability, the Commission was subject to more restrictive, specifically-enumerated evidentiary requirements. *See, e.g.,* A.R.S. § 37–1128 (Supp. 1999).

¶ 7 Based on the Commission's reports, legislation disclaiming the state's "right, title or interest based on navigability and the equal footing doctrine" to the bedlands of the Agua Fria, New, Hassayampa, and lower Salt Rivers, as well as Skunk Creek, was drafted as S.B. 1126. After having the Verde River added as a floor amendment, S.B. 1126 was passed by the legislature and signed into law by Governor Hull on May 4, 1998. Ariz. Sess. Laws 1998, Ch. 43, § 2.[3]

¶ 8 On September 25, 1998, Wildlife filed a complaint against Governor Hull and the State of Arizona, claiming S.B. 1126 violated both the public trust doctrine and the gift clause of the Arizona Constitution. The state, represented by the attorney general,

---

2. 1992 Ariz. Sess. Laws, ch. 297, § 3, eff. July 7, 1992.

3. Now codified as A.R.S. §§ 37–1129 to 1129.03 (Supp.2000).

admitted the allegations of the complaint and added a claim that S.B. 1126 was an unconstitutional violation of the separation of powers doctrine. Governor Hull, however, denied Wildlife's allegations but joined the state in its separation of powers argument. Phelps Dodge and Salt River then were allowed to intervene to argue for the constitutionality of the legislation. On cross-motions for summary judgment, the trial court found in favor of Phelps Dodge and Salt River on the separation of powers issues and in favor of Phelps Dodge, Salt River, and Governor Hull (Appellees) on the public trust and gift clause claims. Wildlife and the state (Appellants) timely appealed and we have jurisdiction pursuant to A.R.S. section 12–2101(B) (1994).

## II. DISCUSSION

### A. STANDARD OF REVIEW

■ ¶ 9 Because the court's ruling below involved pure questions of law, our review is *de novo. See San Carlos Apache Tribe v. Superior Court,* 193 Ariz. 195, 203, ¶ 9, 972 P.2d 179, 187 (1999).

### B. APPELLANTS' CLAIMS

¶ 10 ·Appellants argue that the 1994 Act's standards for determining navigability are so contrary to the federal test of navigability that the statutes are "deliberately designed to defeat trust claims" by setting up a framework of tightly-constructed presumptions that make the legislature's non-navigability findings virtually inevitable. Such a disposition of state trust land, according to Appellants, means that S.B. 1126 is a violation of both the gift clause and the public trust

doctrine. In addition, the state individually asserts that S.B. 1126 is an unconstitutional violation of the separation of powers doctrine. In her answering brief, Governor Hull joins Phelps Dodge and Salt River's arguments supporting the constitutionality of S.B. 1126 but, in contrast, adopts the state's separation of powers argument.

¶ 11 During this appeal we accepted briefs *amicus curiae* filed by the Attorneys General of California, Alaska, and Utah supporting Appellants' position and the Arizona Farm Bureau, which argued that Arizona's prior appropriation system of water usage is irreconcilable with the state's equal footing claims based on navigability.[4]

### C. GIFT CLAUSE AND PUBLIC TRUST DOCTRINE· IN ARIZONA

#### 1. State's Public Trust Obligations and Particularized Assessment Requirements of *Hassell*

■ ¶ 12 Lands located under Arizona's navigable waterways are held by the state in trust for the people of Arizona. *Hassell,* 172 Ariz. at 364–65, 837 P.2d at 166–67. Although the extent of the public trust to be found in the bedlands of Arizona's waterways is presently undefined, the transfer of the as-yet-unknown quantity of land that took place on February 14, 1912, created specific duties for the State of Arizona as trustee. *Hassell,* 172 Ariz. at 366, 837 P.2d at 168 (citing *Illinois Central,* 146 U.S. at 453, 13 S.Ct. 110, and *Kootenai Envtl. Alliance, Inc. v. Panhandle Yacht Club,* 105 Idaho 622, 671 P.2d 1085, 1095 (1983)).[5] Of foremost impor-

4. More specifically, Farm Bureau argues that, because the English common law "was in fact never applied in the west as pertaining to water" and "Arizona expressly rejected the doctrine of riparian water rights," the passing of title to bedlands under navigable watercourses by application of the equal footing doctrine is contrary to Arizona law.

To make this argument, Farm Bureau incorrectly assumes that the equal footing doctrine is inseparable from the doctrine of riparian water rights. Although both doctrines may have been inherited from the common law, and both may invoke "navigability" to define the scope of their respective applications, they are two distinct systems that address two different issues—water use versus land ownership. In addition, such an

argument ignores the fact that the equal footing doctrine has since been codified as federal statutory law. 43 U.S.C. § 1311(a).

We see no inherent conflict in Arizona's laws regarding water use under Arizona's prior appropriation system and land ownership under the equal footing doctrine. Thus, we need not address Farm Bureau's claims further.

5. There is some debate as to whether the statements in *Illinois Central* regarding the fiduciary obligation of states are an expression of federal law. The Supreme Court later characterized *Illinois Central* as an application of Illinois state law. *See Appleby v. City of New York,* 271 U.S. 364, 395, 46 S.Ct. 569, 70 L.Ed. 992 (1926). However, a federal district court has stated that

tance is the state's obligation to administer the public trust consistently with trust purposes. *Id.* at 366, 837 P.2d at 168. In addition, "[t]he leading nineteenth century Supreme Court decisions on state sovereignty made it clear that the states owe a fiduciary obligation to the general public with regard to the management of their sovereign resources," which are, according to *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 475, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988), "public trust" lands. *See* 4 Robert E. Beck, *Waters and Water Rights,* § 30.01(c) (1996). Disclaiming the state's interest in watercourse bedlands that may be part of the public trust, without a "particularized assessment" of the validity of equal footing claims, is both a violation of the gift clause and invalid under the public trust doctrine. *Hassell,* 172 Ariz. at 371, 837 P.2d at 173. Thus, in order to determine whether S.B. 1126 survives gift clause and public trust scrutiny, we must determine whether the legislature performed the necessary "particularized assessment" when enacting S.B. 1126.

■ ¶ 13 The concept of navigability is "essentially intertwined"· with public trust discussions and "[t]he navigability question often resolves whether any public trust interest exists in the resource at all." Tracey Dickman Zobenica, *The Public Trust Doctrine in Arizona's Streambeds,* 38 Ariz. L.Rev. 1053, 1058 (1996). In practical terms, this means that before a state has a recognized public trust interest in its watercourse bedlands, it must first be determined wheth- er the land was acquired through the equal footing doctrine. However, for bedlands to pass to a state on equal footing grounds, the watercourse overlying the land must have been "navigable" on the day that the state entered the Union. *O'Toole,* 154 Ariz. at 45, 739 P.2d at 1362.

## 2. The Federal Navigability Test

■ ¶ 14 A federal determination of "navigability" may serve many different purposes, the three most typical being: to confer admiralty jurisdiction, to define Congress' reach under the commerce power, and to grant title under the equal footing doctrine.[6] *See State of Alaska v. United States,* 563 F.Supp. 1223, 1225 n. 3 (D.Alaska 1983). In addition to the federal tests, states have also adopted a variety of navigability definitions to satisfy different policies regarding resource conservation, apportionment of waterways between private and public uses, and protection of public access to waterways.[7] No aspect of the federal test of navigability used to determine title under the equal footing doctrine precludes the various states from adopting more liberal tests in order to advance other important interests or public uses.[8] *See Hitchings v. Del Rio Woods Recreation and Park Dist.,* 55 Cal.App.3d 560, 127 Cal.Rptr. 830, 834 (1976) ("for purposes of public use of waters, the state may adopt different and less stringent tests of navigability").

■ ¶ 15 Because of the variant circumstances in which navigability is raised, the

*Illinois Central* "involved a fundamental issue of federal law concerning the nature of a state's sovereignty, and the powers assumed by a state upon its admission to the Union." *State of New York v. DeLyser,* 759 F.Supp. 982, 990 (W.D.N.Y. 1991). Although state court decisions generally do not treat *Illinois Central* as binding upon them, see Beck, *Water and Water Rights,* § 30.02(b)(1) n. 140, *Hassell* has already decided the issue. 172 Ariz. at 366, 837 P.2d at 168 (Arizona must administer its land interests "consistently with trust purposes.").

6. For a more detailed discussion of these three different purposes for invoking navigability, see Chris A. Shafer, *Public Rights in Michigan's Streams: Toward a Modern Definition of Navigability,* 45 Wayne L.Rev. 9, 14–25 (1999).

7. *See, e.g., People ex rel. Younger v. County of El Dorado,* 96 Cal.App.3d 403, 157 Cal.Rptr. 815 (1979), and *People ex rel. Baker v. Mack,* 19 Cal.App.3d 1040, 97 Cal.Rptr. 448 (1971), which expanded the state test of navigability to include pleasure boating. These two cases, however, protected a public recreational right in certain waters, which does not implicate navigability under the federal test for title.

8. One leading commentator has even noted that, after the Ninth Circuit's decision in *Alaska v. Ahtna, Inc.,* ·891 F.2d 1401 (9th Cir.1989), "it would appear that the federal law navigability-for-title test and the state law 'pleasure boat' test [citation omitted] are merging and that the beds of virtually all bodies of water suitable for any sort of boating use eventually will be deemed to have been owned by the state at statehood." Beck, *Water and Water Rights,* § 30.01(d)(3)(C).

cases interpreting navigability "cannot be 'simply lumped into one basket.'" *Boone v. United States*, 944 F.2d 1489, 1499 (9th Cir. 1991) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 170, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)); *see also* Glenn J. MacGrady, *The Navigability Concept in the Civil and Common Law*, 3 Fla. St. U.L.Rev. 511, 515 (1975). Indeed, when discussing navigability, any reliance on judicial precedent should be predicated on a careful appraisal of the purpose for which the concept of navigability is invoked. *See id.* For the present purpose, navigability is being used to determine the extent of land the State of Arizona received by virtue of the equal footing doctrine.

▮▮▮▮ ¶ 16 "The standard of navigability for equal footing claims is established by federal law." *Hassell*, 172 Ariz. at 362, 837 P.2d at 164 (citing *Utah v. United States*, 403 U.S. 9, 10, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971)). Indeed, the assessment of navigability for the purpose of determining title to land under watercourses at the time of statehood is a matter of federal rather than state law.[9] *United States v. Oregon*, 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267 (1935) ("[s]ince the effect upon the title to such lands is the result of federal action in admitting a state to the Union, the question, whether the waters within the State under which the lands lie are navigable or non-navigable, is a federal, not a local one"); *United States v. Holt State Bank*, 270 U.S. 49, 55–56, 46 S.Ct. 197, 70 L.Ed. 465 (1926) ("[n]avigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to the

general rule recognized and applied in the federal courts"); *State of North Dakota ex rel. Bd. of Univ. and Sch. Lands v. United States*, 972 F.2d 235, 237(8th Cir.1992) (navigability is a federal question to be decided by a federal test); *State of Alaska v. United States*, 563 F.Supp. 1223, 1225 (D.Alaska 1983) (navigability for title purposes "is a question of federal law to be determined by the rule recognized and applied in federal courts"); MacGrady, 3 Fla. St. U.L.Rev. at 598 ("it is a federal question whether title to submerged lands passed from the federal government to the state government at the time of statehood"). Because of the federal nature of the navigability-for-title definition, "a uniform federal test is mandatory upon the state and federal courts alike." *Hitchings*, 127 Cal.Rptr. at 834.

¶ 17 The federal standard that needs to be applied when determining the extent of watercourse bedlands a state takes by operation of the equal footing doctrine has remained virtually unchanged since the classic definition of navigability was provided by *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870): [10]

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*Id.* at 563, 19 L.Ed. 999; *see also Utah*, 403 U.S. at 10, 91 S.Ct. 1775.

---

9. Appellees argue that "states are free to develop their own jurisprudence for administration of lands it holds in public trust." While this statement is correct, it confuses disposition of public trust lands with the acquisition of title to those lands.

Although individual states are free to pass laws that address the disposition of public trust lands, this power is subject to the obligation of the state to preserve the trust. *See Hassell*, 172 Ariz. at 364–67, 837 P.2d at 166–69. Thus, trust land may only be used in ways that promote the trust's purposes or improve the public's use of the resource. *See id.* In short, a transfer of public trust property is valid as long as the

grantee's use does not impair or interfere with the public interest. *See id.*

10. Admittedly, *Daniel Ball* involved a navigability determination relative to Congress' power to regulate under the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. However, no authority disputes the fact that it is the most accurately stated navigability-for-title test. Indeed, every discussion of navigability in the equal footing context cites *Daniel Ball* as the standard used. Additionally, the *Daniel Ball* test remains "the starting point in determining navigability for resolving title" under the equal footing doctrine. *Alaska*, 563 F.Supp. at 1226

¶ 18 Because of the constitutional nature of the equal footing doctrine,[11] the indisputably federal basis for the navigability for title definition,[12] and our "constitutional obligation" as a state court to uphold federal law,[13] we agree with Appellants that the legislature was obligated to apply the *Daniel Ball* test when determining the potential navigability of the rivers listed in S.B. 1126.

¶ 19 Thus, our next step is to inspect S.B. 1126, as well as the 1994 Act that gave rise to the commission's recommendation that preceded the legislative finding of non-navigability, to ensure compliance with the *Daniel Ball* test.

### 3. Conflicts Between the *Daniel Ball* Test and the 1994 Act

¶ 20 Although the 1994 Act allowed the Commission to "receive, review and consider all relevant historical and other evidence" regarding navigability, *see* A.R.S. section 37–1123(A), the Commission's determination of navigability was governed by the strict standards set forth in section 37–1128.

¶ 21 While it is true that the *Daniel Ball* test is correctly paraphrased in A.R.S. section 37–1101(6) (Supp.2000), other parts of the 1994 Act conflict with the federal standard. Specifically, the 1994 Act contradicts the *Daniel Ball* test by defining the bed of a watercourse from the low-water mark, establishing "clear and convincing" as the burden of proof for determining navigability, and enacting evidentiary limitations and almost irrefutable presumptions in favor of non-navigability.

### a. Definition of Bed

¶ 22 The 1994 Act defines the "bed" of a watercourse as all land below the low-water mark. A.R.S. § 37–1101(2), (7). In contrast, The Submerged Lands Act of 1953, 43 U.S.C. § 1301–15, declares that, under the equal footing doctrine, states take all land under the high-water mark. *Id.* at § 1311. This difference is significant when considering the tremendous impact on the determination of the precise amount of land subject to the state's claims. This conflict alone may be enough to invalidate the 1994 Act as a violation of the gift clause. *See* Zobenica, 38 Ariz. L.Rev. at 1074–77.[14] However, the 1994 Act has other, more significant conflicts with the *Daniel Ball* test.

### b. Burden of Proof

¶ 23 Under the 1994 Act, in order for the Commission to find an Arizona watercourse navigable, navigability must be determined by "clear and convincing" evidence. A.R.S. § 37–1128(B),(D),(G). However, we are unable to find a single federal case in which navigability was subject to a "clear and convincing" burden of proof. To the contrary, a "preponderance" of the evidence appears to be the standard used by the courts. *See, e.g.,* North Dakota v. United States, 972 F.2d 235, 237–38 (8th Cir.1992) (North Dakota did not acquire title to land because at trial it failed to prove by a preponderance of evidence that the Little Missouri River was navigable when North Dakota became a state in 1889).

¶ 24 It may even be argued that proponents of navigability for title purposes need only produce a "scintilla" of evidence to support a finding in their favor. *See Utah,* 403 U.S. at 11–12, 91 S.Ct. 1775 (mere fact that state could prove only susceptibility to use

---

11. *See Oregon,* 429 U.S. at 374, 97 S.Ct. 582; *see also* Beck, *Water and Water Rights,* § 30.01(a)(citing *Coyle v. Smith,* 221 U.S. 559, 566–67, 31 S.Ct. 688, 55 L.Ed. 853 (1911))("[t]he equal footing doctrine is treated by the Supreme Court as of federal constitutional dimension.").

12. See our discussion in ¶ 16.

13. *Allen v. McCurry,* 449 U.S. 90, 105, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

14. Zobenica argues that, because the 1994 Act fails to consider the land between the high-water and low-water marks, implementation of the 1994 Act's definition of bed would automatically relinquish any claim to those lands lying between high-water and low-water marks. *See* Zobenica, 38 Ariz.L.Rev. at 1074–75. This disclaiming of land without a determination of navigability, asserts Zobenica, is an unconstitutional violation of the public trust doctrine pursuant to *Hassell. See id.* at 1077. Based on our resolution of the issues, however, we need not consider Zobenica's theory that the 1994 Act's definition of bed is enough, by itself, to invalidate S.B. 1126.

for carriage of commodities, based on incidents of livestock being transported across portion of lake, was enough evidence to support a finding of navigability). Of course, cases can also be found in which, arguably, more than a "scintilla" of evidence was not sufficient to support a finding of navigability. *See, e.g., North Dakota,* 972 F.2d at 238–40 (an isolated tie drive because of unusually high water, historical presence of ferries used only for transportation across river, present-day recreational canoe use, previous Indian boat use only in shallow water, and inconclusive explorers' journals do not even when considered together, support navigability). In any event, a "clear and convincing" burden of proof is contrary to the *Daniel Ball* test.

### c. Presumptions and Limitations

¶ 25 The 1994 Act contains numerous presumptions and evidentiary limitations that practically foreclose a determination of navigability. *See* A.R.S. § 37–1128(B)–(E). Appellants claim that these presumptions and limitations "conflict sharply" with and are "flatly contrary" to the *Daniel Ball* test. In contrast, Appellees assert that "substantial federal and state case law exists to support the provisions of Section 37–1128(B)(E)." We address each presumption in turn.

### i. Previous Non-navigability Finding

¶ 26 The 1994 Act states that if "any determination of nonnavigability in a public proceeding exists for a watercourse or a portion or reach of a watercourse," it is presumed the entire watercourse is non-navigable, unless clear and convincing evidence is found to the contrary. A.R.S. § 37–1128(B). However, the United States Supreme Court has found that if part of a waterway is navigable, that may be enough support for a finding that the entire watercourse is navigable as well. *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 410, 61 S.Ct. 291, 85 L.Ed. 243 (1940). Thus, we conclude that this presumption conflicts with the *Daniel Ball* test.

### ii. Commercial Use

¶ 27 Section 37–1128(C)(1) states that a watercourse is nonnavigable if it "[w]as not used or susceptible of being used for both commercial trade and travel." Appellees assert that "numerous courts, however, have held that a watercourse must be susceptible to *commercial* use in order to be deemed a 'highway for commerce' (i.e., a 'navigable' watercourse)." Appellees then only cite one case, *Lykes Brothers, Inc. v. United States Army Corps of Engineers,* 821 F.Supp. 1457 (M.D.Fla.1993).

¶ 28 The issue in *Lykes,* however, was whether a certain creek was "a navigable water of the United States under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403." *Id.* at 1458. Because we have already discussed that navigability for title determination under the equal footing doctrine is distinguishable from navigability for determination of federal jurisdiction under the Commerce Clause, see ¶ 14, we find Appellees' argument unconvincing. In addition, the necessity created by section 37–1128(C)(1) that an Arizona watercourse be "used for both commercial trade and travel" before being navigable for title purposes is much more restrictive than the permissive "highway for commerce" language of *Daniel Ball.* The federal test has been interpreted to neither require both trade and travel together nor that the travel or trade be commercial. *See Utah,* 403 U.S. at 11, 91 S.Ct. 1775 (hauling of livestock across lake even though done by owners and "not by a carrier for the purpose of making money" was enough to support a finding of navigability because "[t]he lake was used as a highway and that is the gist of the federal test"). Thus, the restrictions of this presumption also create a conflict with the *Daniel Ball* test.

### iii. Arid Watercourses

¶ 29 Section 37–1128(C)(2) states that a watercourse is nonnavigable if it "[f]lowed only in direct response to precipitation and was dry at all other times." Appellees state that "[m]any federal and state courts" have held that "a watercourse must flow other than merely in direct response to precipitation events."

¶ 30 Again, Appellees claim that "many" courts have so held but merely cite one case. That case, *Oklahoma v. Texas,* 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922), did not explicitly consider precipitation, but found that transportation that is "confined to the irregular and short periods of temporary high water" is not sufficient to support a finding of navigability. 258 U.S. at 591, 42 S.Ct. 406. However, another United States Supreme Court case that was decided at about the same time as *Oklahoma* determined that periodic navigability is enough, even if the river is not susceptible to navigation at all seasons of the year or all stages of the water. *Economy Light & Power Co. v. United States,* 256 U.S. 113, 122, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

¶ 31 Based on this discrepancy, we conclude that a mandatory finding of non-navigability for watercourses that flow in direct response to precipitation, although such a fact may be probative, is contradictory to the *Daniel Ball* test.

### iv. Upstream and Downstream Trade and Travel

¶ 32 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(1) directs that a watercourse is presumptively non-navigable if "[n]o sustained trade and travel occurred both upstream and downstream in the watercourse." Appellees state that "[v]arious courts" have determined that "sustained trade and travel *must occur both upstream and downstream*" before a watercourse can be deemed navigable. Appellees then cite to *Lykes,* 821 F.Supp. at 1463, *Taylor Fishing Club v. Hammett,* 88 S.W.2d 127 (Tex.Civ.App.1935), and *State v. Adams,* 251 Minn. 521, 89 N.W.2d 661 (1958), to support this statement.

¶ 33 As already acknowledged, *Lykes* can be distinguished because it is a case that discusses navigability in the Commerce Clause context. *See* ¶ 28. Although *Taylor* and *Adams* are cases where state courts applied the federal navigability-for-title test, Appellees have overstated those courts' holdings. Specifically, the *Adams* court determined that the lakes in question were non-navigable because they had "not been used

for commerce and do not provide practical routes for commerce, and no lake connects points between which they would be useful as a practical route for navigation." 89 N.W.2d at 677. The *Taylor* court likewise found that the lake under examination was "not wide enough or long enough to provide a practical route for the transportation of commodities in any direction and does not connect any points between which it would be useful as a practical route for navigation." 88 S.W.2d at 130. After examination, the holdings of neither *Taylor* nor *Adams* support the presumption set out in section 1128(D)(1). As such, we find it to be in conflict with the *Daniel Ball* test.

### v. Profitable Commercial Enterprise

¶ 34 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(2) directs that a watercourse is presumptively non-navigable if "[n]o profitable commercial enterprise was conducted by using the watercourse for trade and travel." As discussed above, *see* ¶ 28, nothing in the *Daniel Ball* test necessitates that the trade or travel sufficient to support a navigability finding need be from a "profitable commercial enterprise."

### vi. Vessels

¶ 35 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(3) directs that a watercourse is presumptively non-navigable if "[v]essels customarily used for commerce on navigable watercourses in 1912, such as keelboats, steamboats or powered barges, were not used on the watercourse." Appellees again state that "[m]any courts" support this proposition, yet only point to two cases, *George v. Beavark, Inc.,* 402 F.2d 977 (8th Cir.1968), and *Harrison v. Fite,* 148 F. 781 (8th Cir. 1906).

¶ 36 *Harrison,* however, simply does not support Appellees' assertion. In addition, Appellees have misstated the holding of *Beavark.* The "sole issue" in *Beavark* was whether "float fishing" constituted such commerce as to characterize the stream as navigable for purposes of extending admiralty jurisdiction and limiting a party's liability

under a federal statute. 402 F.2d at 978. When deciding this issue, the court noted that "[t]here is no real problem in arriving at a general definition of navigable waters" and went on to state that " 'the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation,' and that 'it would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway.' " *Id.* at 980 (quoting *The Montello,* 87 U.S. (20 Wall.) 430, 441, 442, 22 L.Ed. 391 (1874)); *see also Holt State Bank,* 270 U.S. at 56, 46 S.Ct. 197 ("navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats"). More recently, another federal district court has determined that the "ordinary modes of trade and travel" element of the *Daniel Ball* test are not fixed and need not be construed with reference only to the "ordinary modes of trade and travel" in existence at the time of statehood. *State of Alaska v. United States,* 662 F.Supp. 455, 463 (D.Alaska 1987).

¶ 37 We agree with the reasoning of *Alaska* and find that the presumption of section 37–1128(D)(3) is inconsistent with the *Daniel Ball* test.

### vii. Diversions

¶ 38 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(4) directs that a watercourse is presumptively non-navigable if "[d]iversions were made from the watercourse to irrigate and reclaim land by persons who made entries under the Desert Land Act of 1877, as amended (43 United States Code §§ 321 through 339), any other federal act or to provide water to lands that are included in a federal reclamation project or an Indian reservation that would have been inconsistent with or impediments to navigation." Appellees fail to support this section of the statute and we are unable to comprehend how such activity creates a presumption of non-navigability. We therefore conclude that section 37 1128(D)(4) is inconsistent with the *Daniel Ball* test.

### viii. Recreational Boating

¶ 39 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(5) directs that a watercourse is presumptively non-navigable if "[a]ny boating or fishing was for recreational and not commercial purposes." Appellees support this presumption by stating that "courts applying the 'federal test' have declined to find watercourses navigable based upon boating and fishing activities if those activities were for recreational purposes only." To support their contention, Appellees cite *United States v. Oregon,* 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935), *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899), and *Toledo Liberal Shooting Co. v. Erie Shooting Club,* 90 F. 680 (6th Cir.1898).

¶ 40 Again, Appellees have apparently miscited a case because we are unable to locate a single reference to recreational activities in *Rio Grande,* let alone find support for the proposition that recreational boating and fishing creates a presumption of non-navigability. Likewise, *Toledo* does not mention recreational activities, unless we consider those boaters in "pursuit" of "duck and water fowl" in the 1890's to be doing so for recreation. 90 F. at 682. Although the boating done by hunters and trappers in *Oregon* was determined by the court to have "no commercial aspects," the boating was never characterized by the court as recreational. 295 U.S. at 21, 55 S.Ct. 610. After a close reading of *Oregon,* it could even be argued that the court made such a finding because the activities of the hunters and trappers did not have the requisite *quantity* of "commercialness" rather than lacking the appropriate *quality* of "commercialness."

¶ 41 It does not go unnoticed that two of the three cases cited by Appellees were decided in the 19th century, while the third was handed down in 1935. As Appellants accurately point out, a more recent decision has held that "evidence of the river's capacity for recreational use is in line with the traditional test of navigability, that is, whether a river has practical utility for trade or travel." *Adirondack League Club, Inc. v. Sierra Club,*

92 N.Y.2d 591, 684 N.Y.S.2d 168, 706 N.E.2d 1192, 1194 (1998). In addition, guided fishing and sightseeing trips, although merely recreational, are "transportation for profit" and can be considered commercial activity under the *Daniel Ball* test. *See State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1405 (9th Cir. 1989). "To deny that ... use of the River is commercial because it relates to the recreation industry is to employ too narrow a view of commercial activity." *Id.*

¶ 42 We conclude that the *Adirondack* and *Ahtna* language quoted above, rather than the more limited *Toledo* and *Oregon* findings noted, more accurately reflects the *Daniel Ball* test.

### ix. Log Floatation

¶ 43 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(6) directs that a watercourse is presumptively non-navigable if "[a]ny flotation of logs or other material that occurred or was possible on the watercourse was not and could not have been regularly conducted for commercial purposes."

¶ 44 It is true that one court has held that a single "tie drive" cannot, by itself, make a river navigable under the *Daniel Ball* test. *North Dakota*, 770 F.Supp. at 510. Even occasional floats, without more evidence that the watercourse was a highway for commerce, has been found by another court to be insufficient to establish navigability conclusively. *Rio Grande Dam*, 174 U.S. at 698, 19 S.Ct. 770. However, none of the cases cited by Appellees mandate that, before a river can be considered navigable, it must be determined that floatation of logs or other material could have been *"regularly conducted for commercial purposes."* Such a requirement exaggerates the specific findings made by individual courts and, as applied by section 37–1128(D)(6), is contrary to the federal test.

### x. Man-made Structures

¶ 45 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(7) directs that a watercourse is presumptively non-navigable if "[t]here were bridges, fords, dikes, man-made water conveyance systems or other structures constructed in or across the watercourse that would have been inconsistent with or impediments to navigation."

¶ 46 "The fact, however, that artificial obstructions exist capable of being abated by due exercise of the public authority, does not prevent the stream from being regarded as navigable in law, if, supposing them to be abated, it be navigable in fact in its natural state." *Economy Light & Power Co.*, 256 U.S. at 118, 41 S.Ct. 409. Thus, we agree with Appellants that "[t]he existence of man-made impediments to travel clearly does not create a presumption of non-navigability under the federal test, which looks at the river's conditions and does not require that travel be continuous or unimpeded."

### xi. Transportation in Proximity to Watercourse

¶ 47 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(8) directs that a watercourse is presumptively non-navigable if "[t]ransportation in proximity to the watercourse was customarily accomplished by methods other than by boat." Although Appellees argue that "several courts" have found transportation in proximity to the watercourse to be "highly probative on the issue of navigability," they cite only two cases.

¶ 48 The first of these two cases, *Lykes*, determined navigability for Commerce Clause purposes and, as acknowledged by us twice previously, is not particularly convincing in the equal footing context. The other case, *Monroe v. State*, 111 Utah 1, 175 P.2d 759 (1946), involved a "comparatively small" lake that "is easier to go around than to cross it." 175 P.2d at 761. Because the court found that the lake "has not been used for transportation of 'goods of commerce'" and reasoned that "it is improbable the lake will ever be valuable as a highway for commerce," the lake was determined to be non-navigable. *Id.* at 760–61. However, the *Monroe* court did not use non-boat transportation in proximity to the watercourse as a presumption of non-navigability nor did it ever assert that overland transportation was

"highly probative" on the issue. To do so, we conclude, is contrary to the federal test.

#### xii. Rivers and Harbors Act

¶ 49 Unless clear and convincing evidence of navigability exists, A.R.S. section 37–1128(D)(9) directs that a watercourse is presumptively non-navigable if "[t]he United States did not regulate the watercourse under the Rivers and Harbors Act of 1899 (33 United States Code §§ 401 through 467e) (1995)."

¶ 50 The Rivers and Harbors Act applies to navigable watercourses of the United States. See, e.g., 33 U.S.C. § 401 ("navigable river, or other navigable water of the United States"); 33 U.S.C. § 403 ("navigable capacity of any of the water of the United States"); 33 U.S.C. § 407 ("any navigable water of the United States"). However, from that definitional truism, it cannot be deduced that the provisions of the Rivers and Harbors Act have been brought to bear on every navigable watercourse in the United States. In other words, simply because the Rivers and Harbors Act applies to navigable watercourses, it does not follow that it *actually has been applied* to every navigable watercourse, nor does it follow that application of the Rivers and Harbors Act is something of a prerequisite to becoming a navigable watercourse.

¶ 51 However, section 37–1128(D)(9) necessitates that, during the approximately thirteen years from the passage of the Rivers and Harbors Act to the date Arizona became a state (when the navigable watercourses in Arizona would be "navigable watercourses of the United States" under the Act), the Act would have had to be applied to the watercourse for it now to be considered navigable. In contrast, the federal navigability-for-title

standards do not have any similar requirements. Thus, such a requirement is contrary to the *Daniel Ball* test.

#### xiii. Forbidden Considerations

¶ 52 A.R.S. section 37–1128(E) also restricts the inherent flexibility of the *Daniel Ball* test by explicitly exempting certain evidence from consideration. More specifically, in deciding whether a watercourse was navigable, the Commission was not allowed to take into account (1) any use of the watercourse under flood conditions, (2) the use of ferries to cross the watercourse, (3) any evidence of fishing from the watercourse's banks, or (4) the fact that water appropriated for beneficial uses before statehood was part of the ordinary and natural condition of the watercourse. A.R.S. § 37–1128(E). It may not be inaccurate to state that certain courts have found that two of these four elements are insufficient to support a finding of navigability.[15] However, because all evidence should be examined during navigability determinations and no relevant facts should be excluded, we find that the exclusions of section 37–1128(E) are contrary to the *Daniel Ball* test. See *Utah*, 283 U.S. at 87, 51 S.Ct. 438.

¶ 53 The 1994 Act's presumptions and limitations directly contradict the *Daniel Ball* test's intent that all relevant facts be considered. Appellees attempt to explain away these significant contrasts by asserting that the *Daniel Ball* test "has been interpreted and applied ... in hundreds of cases by federal and state courts over the past 150 years" and, therefore, "the full scope of the 'federal test' is largely in the eye of the beholder." Our instant analysis demonstrates that such assertions are patently incorrect.

---

**15.** *See, e.g., Oklahoma*, 258 U.S. at 591, 42 S.Ct. 406 (watercourse not navigable because its use for transportation was "confined to the irregular and short periods of temporary high water"); *North Dakota*, 972 F.2d at 239 (ferries that merely "functioned much like bridges" did not establish navigability). However, the case that Appellees cited to support their argument that "courts have interpreted the 'federal test' to mean that evidence of fishing from the bank of a watercourse is not persuasive evidence of the navigability of that watercourse," *State v. Brace*, 76

N.D. 314, 36 N.W.2d 330 (1949), actually stated that there was "no evidence of the public using the lake for fishing, boating for pleasure, or swimming." *Id.* at 333. In addition, although Appellees state that "courts specifically have held that the determination of navigability should not include water from the watercourse that had been appropriated and diverted for beneficial use prior to statehood," the case that Appellees cite, *Monroe v. State*, 111 Utah 1, 175 P.2d 759 (1946), never considered water appropriated or diverted for beneficial uses.

¶ 54 Although the 1994 Act creates presumptions that disfavor navigability determinations, determinations regarding the title to beds of navigable watercourses in equal footing cases must begin with a strong presumption against defeat of state's title. *See United States v. Alaska*, 521 U.S. 1, 34, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997); *see also Oregon*, 295 U.S. at 14, 55 S.Ct. 610 ("[d]ominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged"). In addition, the equal footing doctrine is co-existent with a strong presumption of state ownership.[16] *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 284, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Instead of supporting Arizona's right to these lands as public trust holdings, the presumptions and limitations found in the 1994 Act do quite the opposite by making it almost impossible for an Arizona watercourse to be determined navigable.

¶ 55 We hold that, to prove navigability of an Arizona watercourse under the federal standard for title purposes, one must merely demonstrate the following: On February 14, 1912, the watercourse, in its natural and ordinary condition, either was used or was susceptible to being used for travel or trade in any customary mode used on water. *See The Daniel Ball*, 77 U.S. (10 Wall.) at 563, 19 L.Ed. 999.

¶ 56 After comparing the relevant portions of the 1994 Act to the *Daniel Ball* test, we conclude that the definition of watercourse bed, burden of proof, and limitations and presumptions found in the 1994 Act conflict with the federal test. Although it has been noted that each application of the *Daniel Ball* test is "apt to uncover variations and refinements which require further elaboration," *Appalachian Elec. Power Co.*, 311 U.S. at 406, 61 S.Ct. 291, such a statement should not be interpreted as an invitation for state legislatures to pass laws with stringent evidentiary presumptions and limitations that effectively swallow the long-standing federal test. Not only does the 1994 Act contradict the *Daniel Ball* test, but the two differ to such a degree that we find them to be irreconcilable. Whether the conflicts between the two standards invalidate the 1994 Act, however, depends upon the doctrine of federal preemption.

### 4. 1994 Act's Navigability Standards Are Invalid Under Supremacy Clause and Preemption Doctrine

¶ 57 The preemption doctrine derives from the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2; *see also Fiore v. Collagen Corp.*, 187 Ariz. 400, 402–03, 930 P.2d 477, 479–80 (App.1996). Based on this doctrine, federal laws supersede conflicting state laws. *Id.* at 403, 930 P.2d at 480. Federal preemption is found where the state law is "an obstacle to the accomplishment and execution of the full objectives of Congress." *State v. McMurry*, 184 Ariz. 447, 449, 909 P.2d 1084, 1086 (App.1995) (citations omitted).

¶ 58 We always assume that legislative enactments are constitutional and do not lightly conclude to the contrary. *San Carlos*, 193 Ariz. at 204, ¶ 11, 972 P.2d at 188. However, because it is our responsibility to give potential public trust forfeitures "a close look," we must not merely rubber-stamp the legislature's decision. *Hassell*, 172 Ariz. at 369, 837 P.2d at 171. With these obligations in mind, we hold that the portions of the 1994 Act that conflict with the *Daniel Ball* test, specifically A.R.S. sections 37–1128(B)(G) and 1101(2),(7), are invalid by operation of the preemption doctrine. To what extent this determination affects S.B. 1126, however, is the matter that we address next.

### 5. Analysis of S.B. 1126

¶ 59 In passing S.B. 1126, the legislature relied upon recommendations from the

16. Admittedly, this proposition is forwarded by the Court in the context of whether the federal government had reserved to itself specific lands subject to the equal footing doctrine. However, because the question of "[w]hether title to submerged lands rests with a state ... is ultimately a matter of federal intent," *United States v. Alaska*, 521 U.S. at 36, 117 S.Ct. 1888, we believe the same standard applies to states' attempts to disclaim their land interests granted by equal footing. Thus, we hold that this strong presumption applies in the present context as well.

Commission, which based its findings on an application of the 1994 Act's standards. A.R.S. § 37–1129 to –1129.03 ("The report, finding and recommendation of the commission are ratified and adopted."). The standards articulated in the 1994 Act are not simply invalid because the legislation unlawfully conflicts with federal law. By failing to apply the appropriate navigability test, the Commission's findings do not fulfill the particularized assessment requirement of *Hassell*. Without an appropriate particularized assessment to support the findings of S.B. 1126, the legislation violates the Arizona Constitution's gift clause and the public trust doctrine. *See Hassell*, 172 Ariz. at 371, 837 P.2d at 173.

¶ 60 Appellees argue that any invalidity of the 1994 Act should not be imputed to S.B. 1126 because both the Commission's "comprehensive and lengthy process" and the legislature's "independent finding" of non-navigability allow S.B. 1126 to escape any problems that plague the 1994 Act. Appellees' assertion is unpersuasive as they apparently want the argument to work both ways. They argue S.B. 1126 is valid because the Commission completed a particularized assessment. Thus, the legislature could rely on the Commission's findings and did not have to perform any additional analysis before passing S.B. 1126. However, we have already held that the Commission's findings are invalid.

¶ 61 In that case, assert Appellees, if the Commission's findings are tainted by the conflict between the separate federal and Arizona tests for navigability, then we should conclude that the legislature did not rely on the Commission's recommendation and any impropriety of the statute governing the Commission should not corrupt S.B. 1126. Yet we are unable to find evidence in the record that would support Appellees' claims

that the legislature made independent findings.[17] Rather, we accept at face value S.B. 1126's language stating that the Commission's findings are "ratified and adopted." Therefore, we reject Appellees' heads-we-win, tails-you-lose argument.

¶ 62 The Appellees' assertion that the Commission made a finding of non-navigability even under the "most liberal" federal test is also unpersuasive. To support this assertion, Appellees cite to a single sentence replicated in all four of the Commission's approximately twenty-five-page reports.[18] We, however, cannot find evidence that the Commission performed an analysis using the *Daniel Ball* test. In contrast, we find much evidence that the Commission applied the restrictive and invalid standards regarding navigability that are delineated in the 1994 Act. Thus, from a single sentence, we are unwilling to assume that, in addition to and separately from the state standards, the *Daniel Ball* test was also applied. In short, absent the appropriate particularized assessment, which is based on an application of the *Daniel Ball* federal navigability-for-title standard, Appellees' argument is too tenuous for us to accept when such precious public trust interests are at stake.

### 6. S.B. 1126 is Unconstitutional

¶ 63 We find that the particularized assessment necessitated by *Hassell* was neither performed in accordance with the applicable federal law nor done in a manner consistent with the public trust doctrine. When this assessment is so abrogated, public trust land may be forfeited. Potential forfeiture of the watercourse bedlands in S.B. 1126, by being functionally identical to the outright disclaimer of H.B.2017 in *Hassell*, is a violation of the public trust doctrine and the Arizona Consti-

---

17. Instead, we agree with Wildlife that the "joint legislative committee hearing conducted regarding S.B. 1126 was directed primarily at processing the bill and informing committee members about the Commission proceedings. The hearing did not involve any *de novo* review of the evidence submitted to the Commission nor did the committee elect to apply different standards of navigability than those applied by the Commission and mandated by the 1994 Act."

18. The reports stated "there was little evidence presented to the Commission which showed that, under the most liberal standards set forth in the decisions of federal courts and other state courts, the [river] could be considered navigable for title purposes...."

tution's gift clause. Thus, we hold that S.B. 1126 is unconstitutional.

## D. SEPARATION OF POWERS

¶ 64 Appellants have also raised claims regarding separation of powers problems in S.B. 1126. Since our analysis of the gift clause and public trust doctrine issues has led to a dispositive determination of the matter, we need not reach Appellants' additional claims.

## E. COSTS AND FEES

¶ 65 Wildlife has requested an award of attorneys' fees against Appellees for services performed in the trial court and on appeal under the private attorney general doctrine. *See Arnold v. Arizona Dep't of Health Servs.,* 160 Ariz. 593, 775 P.2d 521 (1989). The private attorney general doctrine is an equitable rule that allows the court to award fees to a party who has vindicated a right that (1) benefits a large number of people, (2) requires private enforcement, and (3) is of societal importance. *Id.* at 609, 775 P.2d at 537.

¶ 66 There can be no challenge either to the benefits of the people of Arizona or to the societal importance of the present litigation.[19] It could be argued, however, that because Arizona's Attorney General was one of the appellants before this court, that the "private enforcement" prong of the *Arnold* test is not satisfied. Yet such an argument ignores the reality that Wildlife was the sole plaintiff in the underlying action filed against Governor Hull and the State of Arizona. While it is true that the state, through the attorney general, admitted most of Wildlife's allegations, Wildlife was still solely responsible for prosecuting its case. It was not until the appellate stage that Wildlife was joined by the attorney general. On appeal, Wildlife and the attorney general were representing different and distinct interests, as demonstrated by the different issues raised and

argued by each party on appeal. Thus, in our discretion, we award Wildlife its reasonable attorneys' fees incurred in the trial court and on appeal, but our award is only against · Governor Hull and the Intervenors Appellees Phelps Dodge and Salt River. This decision is supported by a record that demonstrates that the attorney general conceded the unconstitutionality of S.B. 1126 at the trial court and advocated a similar argument before this court.

## III. CONCLUSION

¶ 67 For the foregoing reasons, we find that A.R.S. sections 37–1128(B)–(G) and 37–1101(2) are preempted by federal law and therefore invalid. In addition, we have determined that S.B. 1126, as a violation of the Arizona Constitution's gift clause and the public trust doctrine, is unconstitutional. Thus, we reverse the trial court's grant of summary judgment in favor of Appellees and remand to the trial court for entry of judgment in favor of Appellants consistent with this decision.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge.

THOMPSON, Judge, concurring in part, dissenting in part.

¶ 68 I agree with the majority's holding that S.B. 1126 does not provide for the kind of "particularized assessment" of Arizona's equal footing claims that we required in *Arizona Center for Law in the Public Interest v. Hassell,* 172 Ariz. 356, 371, 837 P.2d 158, 173 (App.1991), primarily because the navigability standards employed in the legislation are not consistent with federal standards. However, I caution that, beyond this holding, which comes down directly from our decision in *Hassell,* we have declined to go further. And because no significant public right has yet been vindicated by this litigation, I would

---

19. Further, this case is analogous to the situation presented to this court in *Hassell.* In that case, this court found that a particularized assessment was required before anything could be done with the riverbed properties. No title was quieted and no final determinations as to the rights of the parties were made by this court, yet contrary to

the assertions in the special concurrence and dissent, attorneys' fees under the private attorney general doctrine were found to be proper. Consequently, we find them to be proper in this matter also. The rest of the concurrence, of course, is dicta.

not award fees under the private attorney general doctrine, and therefore I dissent from the last part of the opinion.

¶ 69 We have looked to *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), for its classic statement of the equal footing doctrine pursuant to which Arizona's navigable watercourses passed to a trust for the public benefit. However, such watercourses, once identified, would then be subject to conservation or disposition pursuant to our own state jurisprudence. *Hassell*, 172 Ariz. at 365, 837 P.2d at 167. And before we may conclude that Arizona "has a recognized public trust interest in its watercourse bedlands, it must first be determined whether the land was acquired through the equal footing doctrine." (Majority op. at ¶ 13.) Because we have no proper inventory of navigable watercourses before us, we have not determined whether any Arizona land belongs to the state in trust. And if we are in the future asked to evaluate a legislative grant of such trust lands, we will do so according to state law, and not pursuant to federal doctrines such as are set forth in *dicta* in the *Illinois Central* case.

¶ 70 An example of loose language in *Illinois Central* that we cannot apply concerns the discussion of trust purposes:

the people of each state ... hold the absolute right to all their navigable waters, and the soils under them, for their own common use.... The sovereign power itself ... cannot ... make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right.

146 U.S. at 455, 13 S.Ct. 110 (internal citation omitted). Such statements concern "eastern riparian doctrine states ... rather than ... arid appropriation doctrine states...." Douglas L. Grant, *Western Water Rights and the Public Trust Doctrine: Some Realism About the Takings Issue*, 27 Ariz. St. L.J. 423, 456 (1995). They can have no rational application in states such as Arizona where water rights are acquired by individuals pursuant to the law of prior appropriation. *See* Ariz. Const. Art. XVII §§ 1 (common law doctrine of riparian water rights has no force or effect in Arizona), 2 (water rights based on "beneficial use" confirmed); A.R.S. § 45–

141(A) (state waters belong to the public and are subject to appropriation and beneficial use).

¶ 71 While A.R.S. § 45–141(A) has not, apparently, been the subject of judicial interpretation, a nearly identical provision in Colorado is "primarily intended to preserve the historical appropriation system of water rights upon which the irrigation economy ... was founded, rather than to assure public access to waters for purposes other than appropriation." *Colorado v. Emmert*, 198 Colo. 137, 597 P.2d 1025, 1028 (1979). Thus, private ownership and exploitation of equal footing watercourses would not necessarily violate the public trust doctrine, notwithstanding *dicta* to the contrary in the *Illinois Central* case and elsewhere. We recognized this in *Hassell*, when we noted that the United States Supreme Court had not held "that equal footing lands were entirely inalienable." 172 Ariz. at 365, 837 P.2d at 167. Rather, public trust resources may be disposed of if such disposition is consistent with the "public interest in the lands and waters remaining." *Id.* (quoting *Illinois Central*, 146 U.S. at 453, 13 S.Ct. 110).

¶ 72 Therefore, we cannot presume that, once equal footing lands are properly identified, inventoried, and valued, they cannot be alienated through legislative grant for the public purposes involved in the legislation at issue. It is not a foregone conclusion that lands underlying "streams" that were navigable at the time of statehood but now contain little or no surface water could not be granted to private owners as this legislation seeks to do. "Although there were several rivers that were potentially 'navigable' at the time of statehood, many of these watercourses have since become dry riverbeds due to the extensive damming, irrigation, and diversion projects that channel Arizona's water resources to its sprawling desert cities." Tracey Dickman Zobenica, *The Public Trust Doctrine in Arizona's Streambeds*, 38 Ariz. L.Rev. 1053, 1059 (1996). We have already remarked that "land once invested with the public trust may have undergone such changes over time that it is no longer suitable for public trust purposes." *Hassell*, 172 Ariz. at 368, 837 P.2d at 170 (citation omit-

ted). And public trust purposes in arid Arizona must differ significantly from those which pertain in riparian states such as Illinois and New Jersey (the latter said to be for navigation, commerce, and fishing, according to *Illinois Central; see Hassell,* 172 Ariz. at 364, 837 P.2d at 166). Indeed, public trust purposes in Arizona would seemingly include private appropriation and exploitation. *See* "strict" reading of *Illinois Central* in Grant, 27 Ariz. St. L.J. at 456.

¶ 73 The bottom line is that we have not yet determined whether there are equal footing watercourses in Arizona, nor have we decided to what purposes such watercourses may be put. The status quo of uncertainty, which this legislation has attempted to resolve, is restored. No title to Arizona streambeds has been quieted in this litigation; no public right has been resolved or vindicated. Hence, I would not award fees to appellants.